311 Ga. 407
FINAL COPY

S21A0324, S21Z0325. THE STATE v. THOMAS; and vice versa.

NAHMIAS, Presiding Justice.

Tyler Thomas was convicted of malice murder and a firearm crime in connection with the fatal shooting of Ashley Brown during a planned drug deal. The trial court granted Thomas's motion for new trial, however, ruling that the State violated *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963), by failing to disclose a deal between the State and its witness Jaleesa Glenn. On appeal, the State argues that the order granting a new trial should be reversed, while Thomas argues in his cross-appeal that the evidence presented at his trial was legally insufficient to support the jury's guilty verdicts, so a re-trial should be barred by double jeopardy. We reject the arguments in both cases and affirm the trial court's grant of a new trial.[1]

---

[1] The crimes occurred on June 22, 2013. In February 2014, a Fulton

*The Trial*

1. The evidence presented at Thomas's trial showed the following. Ricardo Thomas, Thomas's co-indictee and cousin, provided much of the evidence about the events surrounding the shooting, testifying as follows. On June 22, 2013, Ricardo, who was a drug dealer, arranged for his friend Brown to buy more than nine ounces of cocaine from Thomas for more than $10,000. Ricardo

County grand jury indicted Thomas and Ricardo Thomas for malice murder, two counts of felony murder, aggravated assault, attempted armed robbery, and possession of a firearm during the commission of a felony. Ricardo was also indicted for a third count of felony murder and possession of a firearm by a convicted felon. Thomas was tried first, from May 8 to 12, 2017. Ricardo testified at Thomas's trial without a deal with the State. The jury found Thomas guilty of malice murder, felony murder based on aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony. The jury found him not guilty of attempted armed robbery and felony murder based on that crime. The trial court sentenced Thomas to serve life in prison for malice murder and five consecutive years for the firearm count. The felony murder count based on aggravated assault was vacated by operation of law, and the aggravated assault count was merged. Shortly after Thomas's trial, Ricardo pled guilty to involuntary manslaughter and was sentenced to serve three years in prison (which amounted to time served) and seven years on probation.

Thomas filed a timely motion for new trial, which he amended with new counsel in July 2018 and again two more times in November 2019. After an evidentiary hearing, the trial court granted the motion in September 2020. The State then filed a timely notice of appeal, and Thomas filed a timely notice of cross-appeal. The cases were docketed to the term of this Court beginning in December 2020 and were orally argued on February 2, 2021.

communicated with Thomas and Brown by cell phone throughout the day to arrange the drug deal as he traveled from Carrollton, where he and Thomas lived, to Atlanta, where Brown was staying. Between 1:00 and 2:00 p.m., Melvin Thomas, Jr., another cousin who also lived in Carrollton, picked up Ricardo to drive to see a car show at the World Congress Center in Atlanta. After first stopping at the house of Melvin's mother in Riverdale, Ricardo and Melvin got to downtown Atlanta around 5:00 or 6:00 p.m., but they missed their exit several times and were not able to make it to the show. Instead, they went to an Applebee's restaurant in Atlanta, arriving there around 7:00 p.m.

After dinner, Ricardo and Melvin went to some apartments close by, where they stayed for 30 to 45 minutes and met and talked to Thomas. Then Thomas left to get cocaine for the deal, and Ricardo and Melvin went to a nearby McDonald's restaurant, where Ricardo met Brown, who was driving a burgundy Cadillac Escalade. After about ten minutes at McDonald's, Melvin left. Brown then drove Ricardo to a gas station about 15 minutes away. While there,

Ricardo talked on the phone with Thomas, who told them to meet him at the Dogwood Apartments, which were about ten minutes away.

As Ricardo and Brown were nearing the apartment complex, Thomas called Ricardo and gave him further instructions, including telling him to back into a certain parking spot near the back of the complex. Thomas was already there, in the driver's seat of a maroon Nissan Altima that belonged to his girlfriend Jaleesa Glenn; a man Ricardo had heard people call "Turtle" was in the car too. Thomas got out of the Altima and into the back passenger's side of the Escalade, sliding toward the middle; "Turtle" stayed in the Altima. In the Escalade, Ricardo asked Thomas if the cocaine was "clean"; Thomas said that it was. Brown and Thomas exchanged brief greetings. Then Thomas suddenly pulled out a gun, pointed it at Brown, and told Brown to "[g]ive it up." Brown moved toward the driver's door as Ricardo jumped out of the car and ran away. As he ran, he heard two or three gunshots come from inside the Escalade. He looked back and saw "Turtle" get out of the Altima. Ricardo heard

4

more gunshots, which sounded like they were coming from outside the Escalade. Ricardo then saw the Altima pull out of the apartment complex with the Escalade following it.

Ricardo walked away from the apartment complex and called Thomas and Brown, but neither man answered. Then Thomas called Ricardo, asked if he was all right, and told him not to say anything. Ricardo called yet another cousin to get a ride back to Carrollton. Ricardo next saw Thomas about two weeks after the shooting. Thomas again told Ricardo not to say anything about what happened, threatening to put out an order for Ricardo to be shot if he said anything. Thomas also told Ricardo that Brown's Escalade had hit and damaged the Altima on the back right side.[2]

---

[2] At some point, Thomas also told Ricardo to say that Ricardo and Brown had been trying to buy some marijuana and were robbed by someone else when Brown was killed. That is the story Ricardo told when he was contacted in August 2013 by the lead detective investigating Brown's murder. Ricardo also agreed to meet the detective three days later, but did not show up. Ricardo, who was on probation for possession of marijuana, was then arrested for a probation violation based on his admission that he had participated in a drug deal. After discussing his situation with his attorney, Ricardo again spoke with the detective, giving a story generally consistent with his trial testimony. Ricardo did not mention "Turtle," however, until a later interview that he had with an investigator for the district attorney's office, and "Turtle" was never

Other evidence presented at trial provided additional details about Brown's murder and some corroboration of Ricardo's testimony. A witness testified that "towards 11 o'clock" on the night of the murder, Brown's Escalade crashed into a house a few miles away from the Dogwood Apartments. When the police arrived there, the car's engine was still running, and Brown was dead in the driver's seat. The back driver-side window was broken; the lack of glass near the window indicated that it had been broken at a different location. The medical examiner who conducted Brown's autopsy testified that Brown had been shot five times, causing his death, and the trajectory of all of those shots was consistent with the shots coming from the back seat area of the car while Brown was in the front seat. Bullets and cartridge cases found in Brown's body, in his Escalade, and in the Dogwood Apartments parking lot indicated

---

further identified. Ricardo also did not mention the damage to the Altima to the detective; it is not clear if he mentioned the damage in his interview with the investigator. Ricardo testified that he did not have a deal with the State for his testimony, although he admitted that he was hoping that the State would help with his pending charges based on his testimony.

that at least two guns were used in the shooting.[3] The police also found broken tinted window glass in the parking lot in a location that, if the Escalade were backed into the parking spot, was consistent with the broken back window on the Escalade.[4]

Melvin testified that between 2:00 and 3:00 p.m. on the day of the car show, he called Ricardo and then picked him up to drive to Atlanta to go to the show.[5] They first went to Melvin's mother's

---

[3] Multiple .32-caliber bullets and cartridge cases and .380 bullets and cartridge cases as well as two lead cores were found. A firearms examiner testified that the bullets of matching caliber were fired from the same gun and the cartridge cases of matching caliber were fired from the same gun, but she could not say whether the matching-caliber bullets and cartridge cases were fired from the same gun. Also, she could not determine what gun fired the two lead cores. Thus, she concluded that at least two but as many as six guns were used.

[4] The lead detective testified that there was also a pile of clear glass, which was consistent with the taillight of a vehicle, found at a different place in the parking lot. The State argued in closing that this glass was from the damage Brown's Escalade caused to the rear of the Altima. There was, however, no evidence that the glass came from the Altima or even that the damage to the rear of the Altima included any broken glass. At the motion for new trial hearing, Thomas presented evidence that the Altima's taillight was plastic, not glass; that it was not broken in the crash on the night of the murder; and that the Altima had no broken glass of any kind that night. After this evidence was presented, the State conceded in a post-hearing brief that the inference that the glass found in the parking lot was from the Altima had been proven incorrect.

[5] Melvin did not remember what day the car show was, and the State did not present any evidence other than Ricardo's testimony that the show was on the day of the murder.

house in Riverdale, and then, after they missed the exit for the car show several times, they went to Applebee's for dinner. They then met with Thomas briefly at some apartments,[6] before Ricardo and Melvin went to McDonald's, where Ricardo met with a man in a maroon Escalade and Melvin left. Melvin did not see Ricardo or Thomas again that evening.

Glenn testified that she and Thomas were "old friends" and that she let Thomas borrow her Altima on the day of the murder. He took the car late in the evening and returned it the next morning. When he returned it, the car had been damaged on the back right side. Thomas told her that a motorcycle had hit him and that she should file a report falsely telling the police and her insurance company that she had been involved in a hit and run. She did that, and her insurance company paid for the car repair.

The first 911 call related to the murder was received at 11:25

---

[6] Melvin testified that they were at the apartments for 35 to 40 minutes before Thomas arrived, and they spoke with him for only five to ten minutes.

p.m. on June 22, 2013.[7] Ricardo's cell phone records showed that at 11:27 and 11:34 that night, his phone was near the Dogwood Apartments. The records also showed that between noon and 9:00 p.m. on June 22, Ricardo's phone made or received 82 calls, including 13 with Thomas's phone and ten with Brown's phone. In the hours leading up to the murder — between 9:00 p.m. and 11:23 p.m. — Ricardo's phone made or received 53 more calls, including 18 with Thomas's phone and five with Brown's phone. The call at 11:23 p.m. was made by Ricardo's phone to Thomas's phone but lasted zero seconds. The next and final call between their phones that night was a call Thomas's phone made to Ricardo's phone at 11:34 p.m.; it lasted one minute and five seconds.[8] No evidence was presented about the location of Thomas's cell phone or of any calls between

---

[7] It is not clear from the record if this 911 call was the call made by a witness who heard gunshots at the Dogwood Apartments or the call made by the witness who saw Brown's Escalade crash a few miles away.

[8] The phone records do not appear to support Ricardo's testimony that he also called Brown shortly after the shooting; the last call on June 22 between their phones was a call from Brown's phone to Ricardo's phone at 10:41 p.m. that lasted three minutes and 55 seconds. The next call between their phones was made from Ricardo's phone to Brown's phone at 3:13 a.m. the next day.

Thomas's and Brown's phones.[9]

On November 18, 2013, about five months after the murder, Thomas was arrested at a gas station in Carrollton. Numerous vehicles driven by law enforcement officers from the Carrollton Police Department, Carroll County Sheriff's Office, and the United States Marshals Service followed Thomas into the gas station and tried to box in his car. Thomas began to drive away, hitting a pedestrian in the process. Officers then rammed Thomas's car and arrested him.[10]

Thomas did not testify at his trial. His defense was that the State's case rested on Ricardo's accomplice testimony, which had not been sufficiently corroborated.[11] Thomas was ultimately convicted of

---

[9] The trial court had granted a pretrial motion to suppress Thomas's cell site location data.

[10] This arrest process took about 15 seconds. Most of the law enforcement vehicles were unmarked, but at least one of them was a marked Carroll County Sheriff's car, and at least two of them had blue lights illuminated.

[11] When Thomas's counsel moved for a directed verdict on this basis at the close of the State's evidence and again at the close of all the evidence, the trial court said, respectively, that this was a "close case" and a "very, very close question," but ultimately decided that it was up to the jury and denied the motions. The trial court instructed the jury on the requirement of OCGA § 24-14-8 that accomplice testimony must be corroborated.

malice murder and a firearm charge.

*The Motion for New Trial Proceeding*

2. In his motion for new trial as amended, Thomas alleged that the State violated his right to due process under *Brady* by not disclosing a deal between the State and Glenn. He also argued that the evidence presented at his trial was insufficient to support his conviction because Ricardo's testimony was not sufficiently corroborated as required by OCGA § 24-14-8, which says: "The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient."[12]

At the hearing on the motion, Glenn testified as follows. At the

_____

[12] Thomas also raised a claim of ineffective assistance by his trial counsel, which the trial court ruled was another ground for granting a new trial. Although the State challenges this ruling on appeal, we do not address it because we affirm the new trial order based on the *Brady* holding. Thomas also raised a number of other arguments in his motion for new trial that the trial court considered and rejected. He does not challenge any of those rulings in his cross-appeal.

time of Thomas's trial, she had a pending shoplifting charge from Carroll County, which would be a felony because of her prior shoplifting convictions.[13] The prosecutor who tried Thomas's case, Fulton County Assistant District Attorney Adam Abbate, came to her house with an investigator about two weeks before the trial to ask about her Altima.[14] Glenn told Abbate that she did not remember if Thomas had the Altima on the night of the murder. Abbate told her that if she did not cooperate, she and her mother would be subpoenaed. After that interview, Glenn talked to the attorney representing her on the shoplifting charge and decided to meet with the prosecutor again. She talked to Abbate at the courthouse during Thomas's trial.[15] During that discussion, Abbate noted that he was aware of Glenn's pending felony charge and said,

---

[13] See OCGA § 16-8-14 (b) (1) (C) ("Upon conviction of a fourth or subsequent offense for shoplifting, . . . the defendant commits a felony and shall be punished by imprisonment for not less than one nor more than ten years; and the first year of such sentence shall not be suspended, probated, deferred, or withheld.").

[14] Although Glenn did not remember Abbate's name, she testified that the assistant district attorney she spoke to at her house was the same one who asked her questions at trial.

[15] Glenn testified that she met with Abbate on "the day of trial." Thomas's trial lasted five days; Glenn testified on the third day of trial.

"I'm sure that you don't want to go to jail." He then told Glenn that if she answered the State's questions "as they want[ed] [her] to answer them, then [her] case will go away." On cross-examination at the hearing, Glenn testified that her trial testimony was "not true," but she did not provide more details.

At the hearing, Thomas also introduced into evidence a certified copy of a motion to nolle prosequi Glenn's shoplifting charge, which was filed by the Carroll County District Attorney and granted by Glenn's trial court on July 31, 2017, about a month and a half after Thomas's trial. The reason given for the requested nolle prosequi was "contacted by Fulton County District Attorney's Office. Ms. Glenn testified for the State in a murder case. Asked for the nolle prosequi."

Abbate testified as follows. He was put on Thomas's case four or five days before trial.[16] He spoke to Glenn only once before trial,

_____

[16] Abbate's name, however, appears on the notice from the trial court setting Thomas's case for trial, which was sent to Abbate on January 23, 2017, over three months before the trial began on May 8. In addition, Abbate signed five motions and notices a month or more before trial; two of these were filed

13

and that conversation took place at her house the Friday before trial started on Monday. Glenn did not want to go to court, but the State had already obtained a subpoena for her, and Abbate gave it to her during their conversation. Although Glenn lied at first, eventually she admitted that Thomas had the Altima on the night of the murder. Abbate did not know about Glenn's pending charge before Thomas's trial and never promised to make it go away. He was sure that "we turned over the GCIC" for Glenn, and he remembered that one of Thomas's attorneys had asked him a question about Glenn's criminal history.[17] Abbate told the attorney that he did not know, and the attorney said, "it is in the GCIC." Abbate claimed that he never contacted anyone about nolle prossing Glenn's charge and did not know who would have contacted the Carroll County prosecutor to do so.

---

on March 31, two were filed on April 3, and one was filed on April 8. Thomas's counsel also served a filing on Abbate on April 3.

[17] Glenn's Georgia Crime Information Center (GCIC) report, which was admitted as an exhibit during the motion for new trial proceeding, showed that Glenn had been convicted of three misdemeanor shoplifting charges and then sentenced for one felony shoplifting charge under the First Offender Act before she was charged with the shoplifting at issue here.

One of Thomas's trial attorneys testified as follows. She was aware that Glenn had a pending shoplifting charge, but believed that it was a misdemeanor charge. She did not remember having Glenn's GCIC report and did not ask if the State had promised Glenn any help with the shoplifting charge because she did not think that Glenn would be called as a witness. She attempted to confirm that belief by getting in touch with Glenn, but "in the trial, [Glenn] stopped answering my text messages and stopped answering my phone calls. . . . [A]nd so I did not ask her if she had gotten any promises from the State for assistance with her criminal case."

Based on this evidence and the evidence presented at trial, the trial court ruled that the State had offered to help Glenn with her pending felony charge in exchange for her testimony against Thomas and that the State's failure to disclose this deal violated due process under *Brady*. Thus, the court granted Thomas's motion for new trial. The court also held that the evidence presented at trial was sufficient to support Thomas's convictions.

*Case No. S21A0324 (The State's Appeal)*

15

3. It is well established that

> "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. [at 87]. This includes the suppression of impeachment evidence that may be used to challenge the credibility of a witness. See *Giglio v. United States*, 405 U.S. 150, 154-155 (92 SCt 763, 31 LE2d 104) (1972).

*Danforth v. Chapman*, 297 Ga. 29, 29 (771 SE2d 886) (2015). Thus, "[t]he [S]tate is under a duty to reveal any agreement, even an informal one, with a witness concerning criminal charges pending against that witness[.]" *Gonnella v. State*, 286 Ga. 211, 214 (686 SE2d 644) (2009) (citations and punctuation omitted).

> "To prevail on a *Brady* claim, a defendant must show that the State possessed evidence favorable to the defendant; [the] defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence; the prosecution suppressed the favorable evidence; and had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceeding would have been different."

Id. at 215 (citation omitted).

The State argues that the trial court erred in finding that

16

Thomas met these requirements and in its ultimate ruling granting Thomas a new trial. We review the trial court's factual findings regarding a *Brady* claim under the clearly erroneous standard, see *Strother v. State*, 305 Ga. 838, 850 (828 SE2d 327) (2019), while we review the court's application of the law to the facts de novo, see *State v. James*, 292 Ga. 440, 441 (738 SE2d 601) (2013). Applying these standards, we conclude that the trial court did not err in granting a new trial based on a *Brady* violation.

(a) The State argues that the first *Brady* requirement was not met because the trial court erred in finding that the State promised to help Glenn with her pending felony shoplifting charge in order to secure her testimony. In making this finding, the court specifically credited Glenn's testimony that the State offered to help her, although the court did not credit her implication that the State asked her to give untruthful testimony. The court also relied on

> (2) evidence [that Glenn] was uncooperative with the State shortly before trial, (3) evidence that around the time Glenn started cooperating with the State, she became unresponsive to the communications of [Thomas's] trial counsel, (4) the contradictory testimony

17

of the assistant district attorney who tried the case regarding his knowledge of Glenn's criminal history[18] and (5) the Carroll County prosecutor's motion to nolle pross Glenn's felony shoplifting charge, indicating he was acting per the request of the Fulton County District Attorney's office.

The thrust of the State's argument is that the trial court should have credited Abbate's testimony and should have drawn inferences in the State's favor. For example, the State asserts as to the court's fourth point that Abbate did not give contradictory testimony about his knowledge of Glenn's criminal history because he testified that "we turned over the GCIC" and the court should infer that "we" did not include Abbate, who claimed that he was not put on Thomas's case until a few days before trial. However, the trial court was entitled to disbelieve Abbate's testimony about when he was assigned to the case, particularly in light of the pretrial filings in the

---

[18] The trial court's footnote here said:
The assistant district attorney who tried the case testified that he was not aware of the pending charge against Glenn at the time of [Thomas's] trial; however, he also testified that he had given a copy of Glenn's GCIC to [Thomas's] defense counsel and they had a discussion about Glenn's criminal history. The Court is not persuaded that this prosecutor was unaware of Glenn's criminal history and pending charge when he sought her testimony.

18

case discussed in footnote 16 above, which Abbate was sent or signed a month or more before the trial. The court also could infer that even if Abbate did not personally provide Glenn's criminal history report to Thomas, Abbate was aware of her criminal history because someone on the prosecution team provided that information. And it was clearly within the court's factfinding prerogative to believe Glenn's testimony that she and Abbate discussed her pending felony charge when they met before she testified and that he promised her help with the charge in exchange for her testimony against Thomas. See *Gray v. State*, 309 Ga. 850, 855 (848 SE2d 870) (2020) ("[T]he credibility of the witnesses at the motion for new trial hearing was for the trial court to determine.").[19] In light of the evidence

---

[19] The State also argues that the trial court's reliance on the Carroll County prosecutor's motion to nolle prosequi Glenn's felony shoplifting charge was based on a legal error. In further explaining this point (one of the five points on which the trial court relied), the court cited OCGA § 24-14-22, which says: "If a party has evidence in such party's power and within such party's reach by which he or she may repel a claim or charge against him or her but omits to produce it[,] . . . a presumption arises that the charge or claim against such party is well founded . . . [.]" As the State notes, we have long held that this statute is not applicable in criminal cases, at least in the context of a trial. See *Morgan v. State*, 267 Ga. 203, 205 (476 SE2d 747) (1996) (interpreting a predecessor statute with substantially similar language). However, we have

presented, the trial court's finding that the State had a deal with Glenn was not clearly erroneous.

(b) We turn next to the second *Brady* requirement – that the defendant did not possess the favorable evidence and could not obtain it himself with reasonable diligence. It is undisputed that, if the State had a deal with Glenn as the trial court found, the State had evidence of it and Thomas did not. Thomas filed a pretrial motion asking the State to disclose any deals it offered to witnesses, but the State never informed Thomas of its deal with Glenn.

The State argues that Thomas nevertheless could have obtained evidence of the deal through reasonable diligence by asking Glenn. Because, as the trial court found, Glenn stopped responding to Thomas's counsel around the time of trial, which was also the time

---

also explained that in criminal cases, "[w]hile no legal presumption may arise from the failure to introduce certain witnesses, it is proper for opposing counsel to draw an inference of fact from such failure," "trusting to the good sense of the jury to properly estimate the value of such arguments." Id. at 205-206 (citation, punctuation and emphasis omitted). As the factfinder at the motion for new trial hearing, the trial court could draw a negative inference from the State's failure to present evidence about who from the Fulton County District Attorney's Office (if not Abbate or someone else on the prosecution team) contacted the Carroll County prosecutor and why.

that Glenn was offered the deal by Abbate, the State contends that reasonable diligence required Thomas to question Glenn on cross-examination about any possible deals she had with the State, even though Thomas had no indication that such a deal existed. We are not persuaded that reasonable diligence requires criminal defense lawyers to cross-examine every State witness about a potential deal, just in case there is a deal that the State has improperly failed to disclose, and the State cites no authority for such a requirement. See, e.g., *Gonnella*, 286 Ga. at 215 (holding that the defendant could not have obtained the suppressed part of the witness's plea agreement when it was not in the public record at the time of trial). Compare *James*, 292 Ga. at 442 (holding that the defendants could have obtained a missing page in a report given to them by the State through reasonable diligence when they were on notice that the report was missing a page).[20]

---

[20] The State also asserts that the trial court held that Thomas's trial counsel could have discovered evidence of the deal with Glenn through reasonable diligence because, in ruling on Thomas's claim of ineffective assistance of counsel, the court said:

There is no dispute that Thomas was never informed of a deal between the State and Glenn. Thus, other than its argument that there was no deal, the State does not argue that Thomas failed to show the third *Brady* requirement that the State suppressed favorable evidence.

(c) Finally, the State argues that Thomas has not met *Brady*'s materiality requirement that there be a reasonable probability that the outcome of the proceeding would have been different if the State's deal with Glenn had been disclosed. "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of

---

> Without diminishing the import of the State's failure [to disclose the deal], the Court also notes [Thomas's] trial counsel misunderstood the nature of Glenn's pending charges, thinking Glenn was facing a misdemeanor, not a felony. The Court finds [Thomas's] trial counsel could have likely discovered the impeachment evidence if [she] had better investigated and accurately understood Glenn's criminal history.

The "impeachment evidence" to which the trial court referred, however, appears to be evidence of Glenn's pending *charge*, which trial counsel could have discovered by reviewing Glenn's GCIC report. In its order, the trial court did not expressly consider whether Thomas could have discovered the State's *deal* with Glenn through reasonable diligence, but the conclusion that he could not is implicit in the court's holding that Thomas demonstrated that the State committed a due process violation under *Brady*.

the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (115 SCt 1555, 131 LE2d 490) (1995) (citation omitted). See also *Jones v. Medlin*, 302 Ga. 555, 557-558 (807 SE2d 849) (2017). This test mirrors the test for determining if a lawyer's deficient performance caused prejudice for an ineffective assistance of counsel claim. See *Debelbot v. State*, 308 Ga. 165, 166-167 (839 SE2d 513) (2020). In this analysis, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done, rather than viewing all the evidence in the light most favorable to the verdicts. See id. at 168 n.6.

As outlined in Division 1 above, the evidence of Thomas's guilt came almost entirely from Ricardo's accomplice testimony, and there was much to impeach the story that Ricardo told the jury at trial. He was a convicted felon, as well as a drug dealer who connected Thomas with Brown. Ricardo initially told the lead detective a completely different story of the events leading to Brown's death, which did not include Thomas, and switched to a version that was generally consistent with his trial testimony only after he was arrested for a probation violation and discussed his

predicament with his attorney. Even in this second account to the detective, Ricardo did not mention "Turtle" (someone who could be the second shooter rather than Ricardo) or the damage to the Altima to the detective. The State then indicted Ricardo with Thomas; Ricardo was still facing those charges and a potential life sentence when he testified, and he admitted that he was hoping that the State would help him with his pending charges based on his testimony.

Reasonable jurors therefore would have been looking for corroboration of Thomas's involvement in the murder, and they were instructed in accordance with OCGA § 24-14-8 that such corroboration was required for them to find Thomas guilty. But there was little evidence – all of it circumstantial – to corroborate Ricardo's accomplice testimony. As the trial court explained in its order, at the motion for new trial stage, the State identified "eight specific examples of evidence" that it believed corroborated Ricardo's testimony:

> (1) glass from the victim's Escalade found at the Dogwood Apartments[,] (2) the medical examiner's evidence, (3) ballistic evidence, (4) Melvin Thomas'[s] testimony, (5)

24

Ricardo's cell phone records that place him near the vicinity of the shooting when it occurred, (6) Ricardo's cell phone records reflecting he and [Thomas] were in constant communication on the day of the shooting and in the time frame immediately around the shooting, (7) Glenn's testimony, and (8) [Thomas's] attempt to flee arrest.

The trial court correctly explained that the first three pieces of evidence and the phone records showing Ricardo's location did not corroborate his testimony that Thomas committed the murder because this evidence, although largely consistent with Ricardo's testimony about *where* and *how* the shooting occurred, did not indicate *who* the shooter was or even put Thomas at the scene. See *Crawford v. State*, 294 Ga. 898, 901 (757 SE2d 102) (2014) (explaining that corroborating evidence must "either directly connect the defendant with the crime or justify an inference that he is guilty," meaning that "corroboration of only the chronology and details of the crimes is not sufficient, and there must be some independent evidence tending to show that the defendant himself was a participant in the crimes").

The trial court also pointed out weaknesses in the remaining

corroborating evidence. Melvin's testimony showed only that Thomas met and spoke with Ricardo at some apartments after dinner. See *Gilmore v. State*, 315 Ga. App. 85, 90 (726 SE2d 584) (2012) ("'Testimony which shows nothing more than the defendant was . . . in the company of the accomplice at (even) the approximate time of the offense charged is insufficient corroboration.'" (footnote omitted)). And the corroborative value of Thomas's attempt to flee from arrest in Carrollton five months after the murder was attenuated by the significant amount of time and distance between the murder and the arrest. See *Fisher v. State*, 309 Ga. 814, 820 (848 SE2d 434) (2020) (explaining that a defendant's flight from arrest ten months after the murder as well as two other pieces of evidence were "not much corroboration").

While noting that the phone records showing Thomas's and Ricardo's many communications in the hours before the murder were corroborative, the trial court also recognized that "Glenn's testimony could be viewed as the most significant piece of corroborating evidence offered by the State in a case where the

corroborating evidence was both slight and wholly circumstantial." The court explained that Glenn was someone close to Thomas who testified against him, and her testimony was consistent with Ricardo's testimony about the Altima, "reflected [Thomas] as being dishonest with Glenn about what happened on the night of the shooting, and suggested [that Thomas] was attempting to cover up his association with the vehicle on the night of the shooting." We agree that Glenn's testimony likely played a significant role in the jury's guilty verdicts against Thomas.

Despite this significant role, the trial court noted, Glenn "faced no cross-examination regarding her inducements to testify." In fact, Thomas's counsel did not ask Glenn any questions on cross-examination. The State argues that Glenn was nevertheless seriously impeached by her admission on direct examination that she had filed a false police report and lied to her insurance company about how her Altima was damaged. But there was no indication that Glenn had been investigated, much less charged, for those false statements, and indeed, those admissions actually worked against

27

Thomas, as Glenn testified that he had told her to lie in that way and the effect was to conceal his use of the Altima on the night of the murder.

By contrast, if the State had disclosed its deal with Glenn, Thomas's counsel would have had a powerful tool to undermine Glenn's credibility by showing that she was motivated to implicate Thomas untruthfully by the State's promise to make her pending felony charge "go away." See *Gonnella*, 286 Ga. at 215 ("By failing to provide Gonnella with a crucial detail regarding [the witness's] plea agreement, the State deprived Gonnella of the ability to impeach [the witness] by demonstrating a motive for him to lie[.]"). Given Ricardo's shaky credibility and the overall weakness of the corroborating evidence of Thomas's participation in the crimes, there is a reasonable probability that the outcome of the trial would have been different if the jurors had heard this impeaching evidence. See id. at 216. See also *Dinning v. State*, 266 Ga. 694, 696-698 (470 SE2d 431) (1996) (holding that the State's failure to disclose its offer of immunity for drug charges to certain key witnesses "undermined

28

confidence in the outcome of the trial" in light of "the circumstantial nature of the evidence against [the defendant] and the critical importance of the testimony of [the witnesses]"). Thus, Glenn's deal with the State was material evidence, the State's suppression of the deal violated due process under *Brady*, and the trial court did not err by granting Thomas a new trial on this ground.

*Case No. S21X0325 (Thomas's Cross-Appeal)*

4. In his cross-appeal, Thomas argues that the evidence was insufficient to support his convictions because Ricardo's testimony was not sufficiently corroborated. Unlike in the *Brady* materiality analysis we just conducted, when we evaluate the sufficiency of the evidence to sustain Thomas's convictions,

> we view the evidence in the light most favorable to the verdict, draw every reasonable inference from the evidence that is favorable to the verdict, ignore any conflicts or inconsistencies in the evidence, assume that the jury reasonably believed every word of testimony favorable to the verdict and

29

reasonably disbelieved every word unfavorable to it.

*Debelbot*, 308 Ga. at 168 n.6. Viewed in this light, Ricardo's testimony alone was sufficient to support Thomas's convictions as a matter of due process under the federal Constitution. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

As we have noted above, however, under Georgia statutory law, because the evidence indicated that Ricardo was Thomas's accomplice in the charged crimes, Ricardo's testimony had to be corroborated. See OCGA § 24-14-8; *Raines v. State*, 304 Ga. 582, 587 (820 SE2d 679) (2018). But "sufficient corroboration of accomplice testimony requires only 'slight evidence,'" which "may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime." *Raines*, 304 Ga. at 588 (citation omitted).

Although as discussed above in Division 3 (c), the trial court recognized the weakness of much of the corroborating evidence (and

the fact that half of the asserted examples of evidence on which the State relied were not at all corroborative of Thomas's guilt), the court ultimately concluded that the combination of the evidence of "Thomas's whereabouts, communications, and conduct sufficiently corroborates Ricardo's testimony." Thomas argues that this holding was erroneous because the trial court should have disregarded Glenn's testimony in its analysis and — if that testimony is ignored — Ricardo's testimony was not sufficiently corroborated. But we need not decide whether the corroboration of Ricardo's testimony would be sufficient without Glenn's testimony, because her testimony is properly included in the sufficiency analysis.

This Court has explained that "in considering sufficiency [of the corroboration of an accomplice's testimony], we 'must consider all the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously.'" *Raines*, 304 Ga. at 588 (citing *Cowart v. State*, 294 Ga. 333, 343 (751 SE2d 399) (2013)). Under this principle, it would make little sense for us to ignore Glenn's testimony — which was properly admitted — because

31

information that would have impeached that testimony was withheld by the State and not admitted. The question of how the jury likely would have decided the case had it heard the improperly suppressed evidence that was not admitted at trial is appropriately the subject of the *Brady* materiality analysis that we conducted above in Division 3 (c).

Glenn's testimony along with Melvin's testimony, the cell phone records showing Ricardo's extensive communications with Thomas on the day of the murder, and Thomas's attempt to flee arrest collectively constituted at least "slight" corroborating evidence of Ricardo's accomplice testimony, thereby satisfying OCGA § 24-14-8. Accordingly, we affirm the trial court's holding that the evidence was sufficient to support Thomas's convictions, meaning that the State may retry Thomas if it chooses. See *Cowart*, 294 Ga. at 344.

*Judgment affirmed. All the Justices concur.*

Decided May 3, 2021.

Murder. Fulton Superior Court. Before Judge Downs.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Mathew E. Plott, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for the State.

*Law Firm of Shein & Brandenburg, Marcia G. Shein, Elizabeth A. Brandenburg; The Law Offices of Howard J. Weintraub, Howard J. Weintraub, Benjamin B. Alper*, for Thomas.