316 Ga. 406
FINAL COPY

S23A0111.  HEAD v. THE STATE.

LaGrua, Justice.

Appellant Dennaryl Head was convicted of felony murder and

other crimes in connection with the shooting death of Dwight

Smith.[1] On appeal, Head contends that (1) the evidence presented

---

[1] Smith was shot on November 24, 2006, and died on December 6. On
March 30, 2007, a Fulton County grand jury indicted Head, Miche Hunt,
Michael Smith, and Christopher Sutton for malice murder (Count 1), felony
murder (Counts 2-4), two counts of aggravated assault with a deadly weapon
(Counts 5-6), attempted armed robbery (Count 11), and two counts of
possession of a firearm during the commission of a felony (Counts 12-13). Head,
Hunt, Michael, and Sutton were also each indicted for conspiracy to commit
the crime of armed robbery (Counts 7-10), and Head was separately indicted
for possession of a firearm by a convicted felon (Count 14).

Prior to trial, one of the counts of possession of a firearm during the
commission of a felony (Count 13) was dismissed. In November 2008, Head,
Hunt, and Sutton were jointly tried, but Head's felon-in-possession count
(Count 14) was bifurcated. On November 14, 2008, a jury acquitted Head of
malice murder, but found him guilty on all other counts. After waiving his right
to a jury trial on the felon-in-possession count, Head was acquitted at a bench
trial on November 17.

The trial court merged two of the counts of felony murder (Counts 3-4),
one count of aggravated assault (Count 5), conspiracy to commit armed robbery
(Count 7), and attempted armed robbery (Count 11) into one count of felony
murder (Count 2). Although the trial court purported to merge Counts 3 and 4
into Count 2, they were actually vacated by operation of law. See *Malcolm v.
State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). The trial court sentenced
Head to serve life in prison with the possibility of parole, plus an additional

at trial was legally insufficient to sustain the verdict against him under former OCGA § 24-4-8, and (2) the trial court abused its discretion under former OCGA § 24-3-1 by admitting hearsay testimony from a police detective. We conclude that the evidence was sufficient under former OCGA § 24-4-8 because the testimony of Head's accomplice was sufficiently corroborated. And, pretermitting whether the trial court erred in admitting the challenged testimony, we conclude that any error was harmless.

1. The evidence presented at trial showed that, on the evening

---

five years.

On November 24, 2008, Head filed a motion for new trial, which was amended on October 26, 2011, and again on October 30. The first hearing on the motion for new trial occurred on August 1, 2012. Head's trial counsel requested "at least twenty-four hours" to file a post-hearing brief. The post-hearing brief was never filed. The State filed a motion to dismiss the pending motion for new trial on December 15, 2014, stating that the motion had "remained pending without any activity" since it was filed. Head, acting pro se, responded to the State's motion and renewed his motion for new trial on January 20, 2015. Trial counsel voluntarily surrendered his license to practice law in Georgia on October 5, 2015. On December 16, 2016, the State then filed a motion seeking a status conference or scheduling order concerning Head's motion for new trial. On July 27, 2020, Head's appellate counsel filed an entry of appearance and amended the motion for new trial a fourth time on October 16. Following the second hearing on Head's motion for new trial, the trial court denied the motion on April 13, 2022. Head filed a timely notice of appeal and the case was docketed to this Court's term beginning in December 2022 and submitted for a decision on the briefs.

of November 24, 2006, Head called Michael Smith,[2] Head's co-indictee, to ask if he "still need[ed] some money." Michael responded that he did, and Head instructed him to come by Head's house. According to Michael, he was friends with Head, spoke to Head almost every day, and at some point had mentioned to Head that he needed money to pay off a traffic ticket and help support his father.

That evening, multiple people met at Head's home, whom Michael identified as: Head, Miche Hunt (Head's girlfriend), Christopher Sutton, Jamilah Jarboe (Sutton's girlfriend), and a man named "Sin."[3] Head devised a plan for robbing "the tattoo guy" — Smith — and assigned roles to everyone. Michael and Sutton were supposed to be the "two guys doing the robbing," and Hunt was "supposed to play the role of the girl getting the tattoo." Sin and Jarboe sat and listened but did not participate in the conversation. Head told everyone that the robbery would take place at the "tattoo guy's house" and that it would be "easy, simple, in and out." Head

_____

[2] Michael Smith bears no relation to the victim.

[3] Sin (also referred to as Yassin) was never identified and was not located by law enforcement.

3

wanted Michael and Sutton to carry guns during the robbery. Michael told Head that he did not have a gun, and Head provided him with a .45-caliber handgun that was "nickel-plated at the top with a black bottom."

After spending about an hour at Head's house, Michael, Hunt, Sutton, Jarboe, and Sin all left to drive to Smith's house located on Godfrey Drive in Atlanta, with Jarboe driving the group. Head did not go with the group because he had to stay behind to watch the two children he shared with Hunt. The group arrived at Smith's house around 7:00 or 8:00 p.m. As they exited the car, Michael saw Sutton pull a chrome gun out from underneath his seat. Sin and Jarboe waited outside with the car while Michael, Hunt, and Sutton walked up to the home, and knocked on the door. Smith's younger cousin, later identified as Khiry Clemmons, answered the door. Hunt sat down with Smith and began discussing ideas and pricing for a tattoo. Hunt then got up and went to the bathroom, and Sutton pulled his gun on Smith. Michael pulled out his gun, as well, and ordered Clemmons to the ground. Clemmons complied, but Smith

4

jumped for Sutton's gun. Smith and Sutton tussled over the gun, and the gun went off. Michael saw Smith hit the ground, assumed he had been shot, and then ran out the front door, followed by Sutton and Hunt. The three of them got into the car with Jarboe and Sin, and the group headed back to Head's home. After the group returned to Head's home and told Head what occurred, Head told Hunt that "he needed to have his number changed on his phone," and Hunt responded that she had already planned on changing it. Shortly after this discussion, Michael returned the .45-caliber gun to Head and walked home. Michael was later identified by law enforcement through interviews with other witnesses and ultimately pled guilty to his participation in the shooting.

After the shooting occurred, Clemmons called 911, and Atlanta Police Department ("APD") officers responded to Smith's house. An APD homicide detective arrived on the scene at approximately 8:37 p.m. and took over the investigation. The detective interviewed Clemmons at the scene, and based on that interview and Smith's phone records, he estimated that the shooting occurred between 7:25

p.m. and 7:54 p.m. Smith was transported to Grady Hospital and died from complications of his injury 12 days later.

The detective took possession of Smith's cell phone after the shooting and was able to confirm that Smith's phone number ended in 3137. Cell phone records for Smith's phone number show multiple phone calls between Smith's phone and a number ending in 3159 between 7:24 p.m. on November 22, 2006, and 4:36 p.m. on November 23. On the day of the shooting, November 24, there were multiple calls between Smith's phone and the 3159 number between 11:00 a.m. and 6:42 p.m. On November 22, 23, and 24, the phone records for the phone number ending in 3159 also showed numerous calls to a number ending in 5023. Testimony from phone record custodians showed that the number ending in 5023 was a Sprint account registered to Jamilah Jarboe and the number ending in 3159 was a Metro PCS account registered to Tony Brown. The detective testified that it was not uncommon with Metro PCS accounts for the person using the phone number to have a different name than the one listed on the account. The detective pulled the

6

phone records for the 3159 number, identified one number[4] that had been called multiple times per day from the 3159 number, and called that number in an attempt to identify the user of the 3159 number. Based on that call, the detective determined that the 3159 number was being used by Head.[5] Phone records showed that, at 8:04 p.m., shortly after the shooting, the 3159 number dialed 611. The Metro PCS representative testified that (1) one of the ways to change a cell phone number on a Metro PCS account was to call 611 and (2) the 3159 phone number was changed, but he could not say what time the number was changed.

The detective put together two photo lineups, one that included a photo of Head and another that included a photo of Hunt. The detective showed these lineups to Clemmons, who identified Head and Hunt.[6] Using this identification, the detective obtained arrest

---

[4] The detective did not testify to which number he was referring, and it is not clear from the record what number he called or who picked up that call.

[5] The trial court admitted this testimony over objections from Head. Head contends that the trial court erred in allowing this testimony to stand, the merits of which we discuss in Division 3.

[6] Clemmons later recanted his identification of Head when the detective told Clemmons that Clemmons was mistaken that he saw Head in the house the night of the shooting.

warrants for Head and Hunt.

When Head was arrested on January 2, 2007, a .45-caliber "nickel-plated" gun with a "black bottom" fell from his waistband and was retrieved by law enforcement. The gun was introduced at trial and identified by Michael as the gun Head gave him to commit the robbery against Smith. The murder weapon was never recovered. After arresting Head, the detective attempted to verify whether Head was using the 3159 cell phone number and asked Head what phone number he was using. The detective testified that Head "danced around the question during his interview" and "claimed he did not remember what [his cell phone number] was," but Head ultimately told the detective that the 3159 number had been changed and that he was using the new number. Phone records indicated that the 3159 number was changed to a number ending in 4019.[7] Head did not admit to using the 3159 number and stated that

---

[7] The Metro PCS records for the Tony Brown account show that on November 24, the 3159 line was disconnected and a number ending in 4019 was activated to replace it. The specific time the number was changed is not provided in the record.

Hunt had changed the cell phone number. Head denied being at any meeting where there was a discussion about robbing Smith, "the tattoo guy," and when the detective asked if Head went to Smith's home, Head responded that he did not and instead "stayed at the residence."

After Hunt was arrested, she told the detective that she had used the 3159 number and admitted that she changed the phone number. The detective testified that, during her interview, Hunt identified Michael and told the detective how he could contact Michael. Hunt also told the detective during her interview that she was at a residence with a group of people to plan the robbery of Smith and that she and four other people from the group then went to Smith's home.

Jarboe testified that she was Sutton's girlfriend and had provided a written statement to detectives a couple of months after the shooting. Jarboe's statement about the events on the day of the shooting provided:

> Me and [Sutton] went over [to] his friend[']s house

named Sin. We got there and in the house was Sin and three other people now they was chill and talking then Head started telling [Sutton] that his girl need a ride ova to this tat[t]oo guy house to get one on her back[. . . .] Sin [and] I guess Mike rode with us[.] I drove there[.] [T]hen everyone got out but me [and] Sin[.] [T]hey was in the house for a few[,] came out talking loud[,] tell[ing] me to drive off.

Despite being granted immunity, Jarboe was treated as a hostile witness for the State and testified that she did not know anyone named Head and only wrote that name in her statement because the detective told her to do so. She also denied knowing anyone named Miche Hunt or Michael Smith, but stated that she did know someone named "Yassin" or "Sin." She testified that she just wanted to "make [her] statement make sense to [the detective]" so she could "go home."

Jarboe testified that she drove a group of people to a tattoo parlor so that "Sin's girlfriend" could get a tattoo. She testified that she was the only person using the 5023 number and that she did not know why there was a call from her number to Smith's phone at approximately 7:22 p.m. the evening of the shooting.

The morning after the shooting, Belinda Chaney, who identified herself as Smith's girlfriend, called the detective. Chaney testified that she would periodically call Smith's clients to confirm their tattoo appointments, especially when those clients did not answer Smith's calls. Chaney testified that, on November 22, she called a number to follow up with a woman who was supposed to get a tattoo later that day. Although Chaney could not remember the specific phone number, it was determined that she called a number ending in 3159.[8] When Chaney called the number, the woman who answered told Chaney that she was still coming to get her tattoo that day, but that she was waiting on childcare and needed to get a ride. Chaney testified that this woman was supposed to come and get her tattoo on November 22, but never showed up for her appointment. Clemmons testified that this was the same woman who came to get a tattoo on the night of the shooting because Clemmons was with Smith when Smith received the calls from the

---

[8] The detective testified that he pulled the phone number from Chaney's phone when she came to the homicide office for an interview.

11

woman, and he overheard parts of their conversation.[9]

2. Head contends that the evidence adduced at trial was legally insufficient to sustain the verdict against him under former OCGA § 24-4-8, the statute in effect at the time of Head's trial.[10] Former OCGA § 24-4-8 provided:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and *felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient.* Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness[.]

(Emphasis supplied.) Sufficient corroborating evidence may be

---

[9] Clemmons's uncontroverted testimony at trial was that the woman who showed up at Smith's home the night of the shooting was the same woman who missed her appointment earlier in the week. No further information about Clemmons's knowledge of the woman was provided at trial, and none of the parties objected to his testimony.

[10] This case was tried under the old Evidence Code, see Ga. L. 2011, p. 99, § 101, and for that reason, we cite former OCGA § 24-4-8. We note, however, that the provisions of former OCGA § 24-4-8 are still present in the current Evidence Code and can now be found at OCGA § 24-14-8. Although this case was tried under former OCGA § 24-4-8, because the language of this former Code section still exists under the current Evidence Code in OCGA § 24-14-8, cases decided under the current Code section may apply to cases tried under former OCGA § 24-4-8. Cf. *Styles v. State*, 309 Ga. 463, 466 (1) n.4 (847 SE2d 325) (2020) (noting that the inverse is true and cases decided under former OCGA § 24-4-8 may be applied to cases applying the current Evidence Code OCGA § 24-14-8).

circumstantial, slight, and need not be of itself sufficient to warrant a conviction of the crime charged. See *Styles v. State*, 309 Ga. 463, 467 (1) (847 SE2d 325) (2020). "Corroboration of only the chronology and details of the crimes is not sufficient, and there must be some independent evidence tending to show that the defendant himself was a participant in the crimes." Id. (citations and punctuation omitted). See also *Doyle v. State*, 307 Ga. 609, 611 (1) (837 SE2d 833) (2020) ("The corroborating evidence may be circumstantial and slight, and need not be sufficient in and of itself to warrant a conviction, so long as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt." (Citation and punctuation omitted.)). The sufficiency of corroboration is a matter for the jury to decide, and in considering sufficiency, we must consider all of the evidence that was admitted by the trial court, regardless of whether that evidence was admitted erroneously. See *Raines v. State*, 304 Ga. 582, 588 (2) (a) (820 SE2d 679) (2018). And multiple alleged accomplices may corroborate one another's testimony. See *Handley v. State*, 289 Ga.

13

786, 786 (1) (716 SE2d 176) (2011) (holding that the credibility of multiple accomplices corroborating one another's testimony was sufficient to satisfy OCGA § 24-4-8). See also *Huff v. State*, 300 Ga. 807, 809 (1) (796 SE2d 688) (2017) ("The testimony of one accomplice may corroborate that of another."). Additionally, the jury is also "entitled to disbelieve" the testimony of a witness or defendant because the jury is the judge of the credibility of witnesses. See *Arnold v. State*, 286 Ga. 418, 419 (1) (687 SE2d 836) (2010).

For the reasons explained below, we conclude that the evidence corroborating Michael's testimony about Head's participation in the crime was sufficient and that "the evidence was also sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that [Head] was guilty of the crimes of which he was convicted." *Crawford v. State*, 294 Ga. 898, 902 (1) (757 SE2d 102) (2014) (holding that evidence of phone records was sufficient to corroborate the accomplice's testimony despite the fact that the records "neither reveal the content of the [phone] conversations nor even confirm that [the defendant] himself, as opposed to some other person using his

14

phone, was a party to the calls").[11]

(a) *Michael's Testimony*

Michael testified that, the evening of the shooting, he, Head, Hunt, Sutton, Jarboe, and Sin were all discussing robbing Smith and that Head was "leading the discussion" and assigning "roles," specifically, that Hunt would pretend to be interested in getting a tattoo and that Sutton and Michael would "do[ ] the robbing." Michael stated that Head wanted him to carry a gun, and, when Michael told Head he didn't have a gun, Head provided him a .45-caliber handgun that was "nickel-plated at the top with a black bottom." Michael further testified that Jarboe drove him, Hunt, Sutton, and Sin to Smith's home to execute the robbery, but that Jarboe and Sin waited outside. After the shooting occurred, Michael testified that the group ran out of Smith's home, jumped in the car,

---

[11] Although Head does not set forth a separate enumeration contending that the evidence was insufficient as a matter of federal constitutional law, we note that, as a matter of federal due process, accomplice testimony does not need to be corroborated, so Michael's testimony alone was sufficient to support Head's convictions. See *State v. Thomas*, 311 Ga. 407, 420 (4) (858 SE2d 52) (2021). See also *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

and yelled at Jarboe to drive away quickly. Once they returned to Head's home, Michael testified that Head was "going on and on about [how] he needed to have his number changed on his phone," and Hunt responded that it had already occurred to her that the phone number needed to be changed.

(b) *Corroborating Evidence*

Although the majority of the evidence implicating Head came from his accomplice, Michael, multiple pieces of evidence corroborated Michael's testimony and authorized the jury to conclude that Head was sufficiently involved in Smith's shooting to convict him of the crimes with which he was charged, at least as a party to the crime. OCGA § 16-2-20 (b) (3) and (4) (a person is a party to a crime if he "aids or abets in the commission of the crime" or intentionally "advises, encourages, hires, counsels, or procures another to commit the crime"). See also *Willis v. State*, 315 Ga. 19, 24 (2) (880 SE2d 158) (2022) ("[A]lthough the defendant's mere presence at the scene is not enough to convict him as a party to the crime, the jury may infer his criminal intent from his presence,

16

companionship, and conduct before, during, and after the offense." (Citation and punctuation omitted.)). Additionally, the jury was properly instructed on the requirement that an accomplice's testimony be corroborated and, having received this instruction, "the jury was the proper arbiter of the weight" afforded to the statements of Jarboe, Hunt, and the detective as well as the phone records in "establishing [Head's] complicity in the crimes." *Crawford*, 298 Ga. at 901-902 (1).

Jarboe's written statement to police describing the events that occurred the day of the shooting corroborates Michael's testimony that Head was at a meeting where a group was planning to rob Smith. Jarboe stated that she and Sutton went to a residence where there was "Sin and three other people." She then identified Head and Head's girlfriend (Hunt) in her statement. Therefore, the jury could have logically concluded that, once Jarboe and Sutton arrived at the residence, there were six people present, which corroborates Michael's testimony identifying five people at the meeting, in addition to himself. The jury could also have concluded from this

17

statement that, according to Jarboe, she, Sutton, Head, Hunt, and Sin were all at a residence on the day of the shooting. Jarboe further stated that Head told Sutton that he (Head) needed someone to drive his girlfriend (Hunt) to "this tat[t]oo guy house" to get a tattoo and that Jarboe and Sutton then agreed to take Hunt to get a tattoo. Thus, the jury could, at the very least, "infer [Head's] guilt" because these statements corroborated Michael's testimony about Head assigning Hunt the "role" of the girl getting the tattoo. *Doyle*, 307 Ga. at 611 (1). Jarboe stated that Sin, Hunt, and "Mike," rode with her and Sutton to take Hunt to get a tattoo, from which the jury could infer that Jarboe was identifying Michael and corroborating his testimony that Jarboe drove the group to execute the robbery. Jarboe further stated that she and Sin waited outside and "[everyone] was in the [tattoo guy's] house for a few" before they "came out talking loud tell[ing] me to drive off," which corroborates Michael's version of events immediately after the shooting occurred. Although she denied the veracity of her written statement to police on the stand, the jury is tasked with resolving evidentiary conflicts

18

and assessing witness credibility and was at liberty to believe Jarboe's written statement to police over her testimony on the stand. See *Munn v. State*, 313 Ga. 716, 721 (1) n.11 (873 SE2d 166) (2022) ("It is axiomatic that resolving evidentiary conflicts and assessing witness credibility are within the exclusive province of the jury." (Citation and punctuation omitted.)).

The detective testified that, during her interview, Hunt said that she was present at a residence "with some other parties" where the group discussed a plan to rob Smith, which supports Michael's testimony about the meeting and confirms Hunt's presence at that meeting.[12] She then stated that, after the meeting, "five people including herself" went to Smith's residence, which matches Michael's testimony about the five people — Hunt, Sutton, Jarboe,

---

[12] Because Hunt, Head, and Sutton were all tried together, much of the detective's testimony relaying statements made by Hunt or Head were strictly limited so as to not use the testimony of one defendant to inculpate the other. See *Simpkins v. State*, 303 Ga. 752, 755 (II) (814 SE2d 289) (2018) (noting that "the admission of a 'powerfully incriminating' statement by a non-testifying co-defendant that inculpates a defendant in the charged crimes unconstitutionally deprives the defendant of his or her Sixth Amendment right to cross-examine witnesses") (citing *Bruton v. United States*, 391 U. S. 123, 126 (88 SCt 1620, 20 LE2d 476) (1968)).

Sin, and himself — that drove to Smith's house. Further, Hunt admitted that (1) she used the 3159 number that was used to call and make the tattoo appointment with Smith, and (2) she later had the 3159 number changed. The call to 611 around 8:00 p.m. on the night of the shooting also serves as evidence that the number was changed that night. Hunt's statements corroborate Michael's version of the facts that, once the group returned to Head's house, Head was concerned about changing the phone number and talked with Hunt about having it changed.

Therefore, the statements of Jarboe and Hunt corroborate Michael's testimony that Head was present at a meeting to plan the robbery of Smith (where six people were present), that everyone except Head (five people) went to Smith's house to execute the robbery, and that when they returned to the initial meeting place, Head and Hunt decided that they needed to change the 3159 number on the phone. Head's own statements about using the phone number after it was changed and that Hunt changed the number further corroborate this testimony. And, assuming that Hunt and Jarboe

20

were also accomplices, the "testimony of one accomplice may corroborate that of another." *Huff*, 300 Ga. at 809 (1). The testimony of the witnesses corroborating Michael's testimony about the number of people at the residence where the robbery was planned is important because Head's involvement in the crime — and his conviction — is based on his presence and participation at the meeting where the robbery was planned. Jarboe's written statement about Head's request to Sutton about driving Hunt to get a tattoo corroborated Michael's testimony that Head instructed the group to go to Smith's residence under the guise of getting a tattoo. Further, the group returned to the meeting place to report back to Head what had happened before Head and Hunt discussed changing the number on the cell phone. The jury was therefore authorized to conclude that Head's "communication with the group before and after the crimes" was evidence of Head's criminal intent and implicated him in Smith's shooting, *Willis*, 315 Ga. at 25 (2), and that this evidence was sufficient to corroborate Michael's testimony about Head's involvement.

Moreover, despite Head's ability to avoid explicitly admitting his involvement in Smith's shooting, he did tell the detective that he did not go to Smith's home and, instead, "stayed at the residence," from which the jury could disbelieve Head's version of the facts — as it pertains to the purpose of the meeting at the house that occurred before the shooting — and conclude that he was, in fact, at a residence planning the robbery of Smith before the rest of the group left to execute said robbery. See *Arnold*, 286 Ga. at 419 (1).

Although Head contends (and we address in Division 3) that the detective's testimony identifying Head as the person using the 3159 phone number was improperly admitted, "[t]his Court  has explained that in considering the sufficiency . . . of an accomplice's testimony, we must consider all the evidence submitted by the trial court, regardless of whether that evidence was admitted erroneously." (Citation and punctuation omitted.) *State v. Thomas*, 311 Ga. 407, 420 (4) (858 SE2d 52) (2021). Therefore, the evidence showed that Head was at least, according to the detective, linked to the phone that made calls to Smith in the days leading up to the

shooting. And, even without considering the contested phone number testimony, Head admitted (1) to using the phone after the shooting occurred and the number was changed; (2) that he knew his girlfriend had the number changed on that phone; and (3) that he continued to use that phone after its number was changed.

Finally, when Head was arrested, a .45-caliber gun matching the description Michael provided fell from his waistband and was introduced as an exhibit at trial. Although taken individually, each of the pieces of evidence do not corroborate every detail of Michael's testimony, taken together, the evidence sufficiently supports Michael's testimony because "only slight evidence of corroboration is required." (Citation and punctuation omitted.) *Barber v. State*, 314 Ga. 759, 763 (1) (879 SE2d 428) (2022). Corroborating evidence "need not be sufficient in and of itself to warrant a conviction, so long as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt." (Citation and punctuation omitted.) Id. at 763-764 (1). And, it is "within the exclusive province of the jury" to determine whether

there was an inference of guilt based on the evidence submitted to it. *Munn*, 313 Ga. at 721 (1) n.11. Therefore, the evidence is sufficient. See *Barber*, 314 Ga. at 763 (1).

3. Head contends that the trial court abused its discretion under former OCGA § 24-3-1[13] by admitting hearsay testimony from the detective about Head's use of the 3159 number that connected Head with the charged offenses. This claim fails for the reasons that follow.

A trial court's error in allowing hearsay testimony is harmless if it is highly probable that the alleged error did not contribute to the verdict. See *Lyons v. State*, 309 Ga. 15, 22 (4) (843 SE2d 825) (2020) ("The test for determining . . . harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted.)). See also *Williams v. State*, 313 Ga. 443, 448 (1) (870 SE2d 397) (2022) (noting that evidentiary errors are "harmless if it is highly probable that the error did not

---

[13] Former OCGA § 24-3-1 defined "hearsay" as evidence that "does not derive its value solely from the credit of the witness but rests mainly on the veracity and competency of other persons."

24

contribute to the verdict" (Citation and punctuation omitted.)).

Assuming, without deciding, that (1) the detective's statement that

Head was using the 3159 number was inadmissible hearsay, and (2)

Head properly preserved this objection for appellate review, we

conclude that any error by the trial court in allowing the evidence

was harmless.[14] See *Harris v. State*, 313 Ga. 872, 882 (4) (874 SE2d

73) (2022) ("[A]ny [statements] that were erroneously admitted were

harmless in light of the properly admitted [statements]."). "In

determining whether the error was harmless, we review the record

de novo, and we weigh the evidence as we would expect reasonable

---

[14] The State argued at the motion-for-new-trial hearing that the basis for Head's objections to the detective's testimony were not specific enough to preserve the error, and the trial court agreed, citing *Powell v. State*, 335 Ga. App. 565, 568 (782 SE2d 468) (2016). Id. ("When the specific ground of the objection is not made at the time the evidence was offered, the failure to do so amounts to a waiver of that specific ground." (Citation and punctuation omitted.)). See also *Hites v. State*, 296 Ga. 528, 530 (2) (769 SE2d 364) (2015) ("[I]n order to raise on appeal an impropriety regarding the admissibility of evidence, the specific ground of objection must be made at the time the evidence is offered, and the failure to do so amounts to a waiver of that specific ground." (Citation and punctuation omitted.)). The trial court judge presiding over the motion-for-new-trial hearing was the same judge that presided over the trial, and was therefore the same judge that heard the objections. Plain error review for errors that were not objected to at trial is only available for cases tried after January 1, 2013. See OCGA § 24-1-103 (d). Because Head was tried in 2008, he cannot avail himself of plain error review, if indeed he failed to properly object. However, we need not decide that issue today.

jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." (Citation and punctuation omitted.) *Middlebrooks v. State*, 315 Ga. 671, 684 (1) (884 SE2d 318) (2023). Further, "the erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced." *Anglin v. State*, 302 Ga. 333, 336 (2) (806 SE2d 573) (2017). See also *Lopez v. State*, 311 Ga. 269, 276 (2) (b) (857 SE2d 467) (2021). In Division 2, we reviewed the evidence submitted at trial to determine if it was sufficient to corroborate Michael's testimony. We now review the evidence de novo, and, having done so, we conclude that because it is highly probable that the alleged hearsay testimony did not contribute to the verdict, any error was therefore harmless. See *Pritchett v. State*, 314 Ga. 767, 778-779 (2) (c) (879 SE2d 436) (2022).

At trial, the detective testified that he reviewed the phone records for the 3159 number; noticed a number that was called frequently; called that number; and by calling that number, he was able to determine that the 3159 number belonged to Head.

Head argues that the State placed too much weight on the detective's testimony about the 3159 number and that the State failed to present any other evidence independent of Michael's testimony to support Head's alleged involvement. We disagree. The detective's testimony that the 3159 number "belonged to Head" did very little to implicate Head or corroborate Michael's testimony in light of the other evidence presented. Jarboe's phone number — not the 3159 number — was the one used to call Smith's phone at approximately 7:22 p.m. on the night of the shooting. Clemmons's undisputed testimony at trial was that the woman who called to make the tattoo appointment days earlier — Hunt — was the same woman who showed up for a tattoo appointment the night of the shooting. And, a woman's voice answered when Chaney called the 3159 number to confirm a tattoo appointment with that same client a few days before the shooting.

Independent of both Michael's testimony and the detective's testimony associating the 3159 number with Head, the evidence discussed in Division 2 provides the jury with a sufficient basis to

27

determine Head's guilt. Further, the alleged hearsay testimony connecting Head with the 3159 phone number that called Smith to make the tattoo appointment is essentially cumulative of the testimony provided by Hunt through the detective at trial. Because Head admitted that he used the 3159 number after it was changed, any of the detective's hearsay testimony reinforcing the statements made by Hunt and Head was cumulative. And, "weighing [this] evidence as we would expect reasonable jurors to have done," we thus conclude that any error on the part of the trial court in admitting this hearsay testimony was harmless. *Pritchett*, 314 Ga. at 778-779 (2) (c). See also *Davenport v. State*, 309 Ga. 385, 389 (2) (846 SE2d 83) (2020) ("A nonconstitutional error is harmless if it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted.)).

*Judgment affirmed. All the Justices concur, except Warren, J., who concurs in judgment only in Division 2.*

Decided May 31, 2023.

Murder. Fulton Superior Court. Before Judge Newkirk.

*Shein Brandenburg & Schrope, Elizabeth A. Brandenburg*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Burke O. Doherty, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General*, for appellee.