S00A1062. BYRD v. OWEN.
(536 SE2d 736)

SEARS, Justice.

The habeas court granted relief to petitioner/appellee Jeffrey Owen after it was revealed that the prosecution failed to disclose an immunity agreement with its main witness at trial. We conclude that the habeas court's grant of relief was proper. For approximately 13 years, the State failed to disclose its immunity agreement with its primary trial witness, despite its obligation of disclosure under *Brady v. Maryland*[1] and *Giglio v. United States*.[2] Our review of the recorded proceedings in the trial and habeas courts leads us to conclude that: (1) if the State's immunity agreement with its primary trial witness had been disclosed as required, there is a substantial likelihood that the outcome of the trial could have been different; and (2) concealment of the agreement interfered with counsel's ability to render effective assistance at trial and on appeal. Therefore, we

---

affirm the habeas court's grant of relief.

Owen was indicted in 1989 for a drug-related murder and possession with intent to distribute marijuana. He waived his right to a jury trial upon the recommendation of counsel, was convicted at a bench trial, and was given a life sentence.

On direct appeal to this Court, Owen was represented by his trial counsel, Spruell. This Court heard oral arguments in October 1994, and thereafter issued *Owen v. State*,[3] in which we found that the prosecution had violated *Brady* and *Giglio*, supra, by failing to turn over evidence of negotiations between Cobb County police officers and two of the State's witnesses, Joe and Robin Tays, despite a timely request for all *Brady* materials. Those negotiations led to immunity agreements in which the State agreed not to prosecute the Tayses for drug crimes in exchange for their testimony against Owen at trial.[4] In *Owen*, this Court noted that evidence of the Tayses' immunity agreements was found in police files, and while we expressed some reluctance to impute actual knowledge of the agreements to the District Attorney, we concluded that the evidence was in the State's possession and should have been disclosed under *Brady*, supra.[5] However, this Court determined that there was not a reasonable probability that, had the *Brady* material been disclosed before trial as required by law, the bench trial's outcome would have been different. For that reason, we held that the *Brady* violations did not require reversal of Owen's convictions, and we affirmed.[6]

Thereafter, Owen filed a petition for habeas corpus relief and the State responded. Discovery was conducted, and it was revealed that before the bench trial commenced, the State also had reached an immunity agreement with a *third* witness — William Kent — and also had failed to disclose that agreement before trial. Nor did the State disclose Kent's immunity agreement to this Court during Owen's direct appeal, even though the main issue on appeal was whether the State's concealment of the Tayses' immunity agreements mandated reversal.[7] Unlike the Tayses' immunity agreements, which were arranged by police officers, the evidence shows that the Cobb County District Attorney personally arranged for Kent's immunity agreement through discussions with Kent's attorney.

A hearing was held before the habeas court and Attorney Spruell testified that, had he known of Kent's immunity agreement, he would

---

[3] 265 Ga. 67 (453 SE2d 728) (1995).

[4] Id., 265 Ga. at 68.

[5] Id., 265 Ga. at 69, n. 2.

[6] Id., 265 Ga. at 70.

[7] Id., 265 Ga. at 68-70.

"have never considered waiving a jury" at Owen's trial.[8] Testimony was also heard from Kent's former attorney, and he authenticated a letter he wrote to the Cobb County District Attorney memorializing the immunity agreement. The letter is dated April 12, 1987, more than three years before Owen's trial commenced.

Based upon the State's failure to disclose the Kent immunity agreement, the habeas court granted relief to Owen. The State appeals, and we affirm.

1. A reasonable likelihood exists that, had Kent's immunity agreement been disclosed to the defense, the outcome of Owen's trial could have been different.

Kent undoubtedly was the State's key witness against Owen, and he testified both before the grand jury that indicted Owen and at Owen's trial for murder. At trial, Kent testified that he and the murder victim were partners in a drug dealing enterprise. Kent warehoused the enterprise's large quantities of marijuana in his North Georgia home, and the enterprise's drug sales often were conducted at Kent's home. Kent testified that in April 1987, he and the victim were negotiating a drug sale to Owen, which Kent characterized as a "big, big deal." The drug enterprise received a large shipment of marijuana, which was stored in Kent's basement. Kent then left Georgia to visit family in New York. While in New York, Kent received word from the murder victim that the latter was meeting with Owen at Kent's home to "get some work done." Later that day, the victim's body was discovered in the basement of Kent's home; he had been shot in the head. Digital scales used to weigh drugs were found near the body; they had been removed from their normal storage place in the basement and had been activated. A large quantity of marijuana was missing from Kent's home, but other drugs were discovered when the police arrived at the scene.

When cross-examined at trial, Kent was asked "what kind of deal" he had arranged with the State to avoid prosecution for drug trafficking. He testified that "he knew there was a possibility" that he could avoid such charges, and that he had not yet been charged for drug trafficking. He did not, however, divulge his negotiated immunity agreement with the State, nor did the State's attorney elicit a response from Kent about the immunity agreement while conducting a redirect examination.[9]

It is irrefutable that "[d]eliberate deception of a court and jurors

---

[8] The record does not contain a written waiver of a jury trial, but Attorney Spruell admits that he made a tactical decision to waive Owen's right to be tried by a jury.

[9] On redirect, the State's attorney asked Kent if he had been told he would not be charged with drug trafficking. Kent evaded answering the question, and the State did not pursue that line of questioning any further.

by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' "[10] The same conclusion is reached when the State, even though it does not actually solicit false evidence, "allows it to go uncorrected when it appears."[11] Any conviction resulting from false testimony knowingly used by the State is incompatible with this country's standards of justice and justifies reversal.[12] In this case, as explained above, Kent was asked by defense counsel what kind of deal he had struck with the State in order to avoid prosecution, and his response was incomplete and evasive. On redirect examination of Kent, the prosecution did not attempt to clarify that it had agreed not to prosecute Kent in exchange for his testimony against Owen. In a virtually identical situation, the United States Supreme Court held that due process required the reversal of a criminal conviction.[13] The same result must obtain here.

As stated in *Brady*, supra:

The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.[14]

Whenever the reliability of a witness may have been a factor in the determination of an accused's guilt, the State's non-disclosure of evidence affecting such credibility falls within this *Brady* principle.[15] Stated differently, impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule.[16]

*Brady* does not, of course, mandate reversal for the suppression of minor evidence; a finding of materiality is required first.[17] When, as in this matter, the prosecution fails to correct what it knows to be false testimony given by a State's witness, the falsehood is deemed to be material " 'if there is any reasonable likelihood that the false testimony *could have* affected the judgment of the [fact finder].' "[18]

---

[10] *Giglio*, 405 U. S. at 153 (quoting *Mooney v. Holohan*, 294 U. S. 103, 112 (55 SC 340, 79 LE 791) (1935)).

[11] Id.; *Pyle v. Kansas*, 317 U. S. 213 (63 SC 177, 87 LE 214) (1942).

[12] *Brady*, 373 U. S. at 103; *Pyle*, 317 U. S. at 215-216.

[13] *Giglio*, 405 U. S. at 155.

[14] *Brady*, 373 U. S. at 87-88. The issue of whether the State's concealment of Kent's immunity agreement requires reversal is not waived because the State's concealment of the issue prevented counsel from raising it on direct appeal. See *Turpin v. Todd*, 268 Ga. 820, 826-828 (493 SE2d 900) (1997).

[15] *Giglio*, 405 U. S. at 154.

[16] *United States v. Bagley*, 473 U. S. 667, 676 (105 SC 3375, 87 LE2d 481) (1985); *Owen*, 265 Ga. at 68.

[17] *Bagley*, 473 U. S. at 677.

[18] *United States v. Alzate*, 47 F3d 1103, 1110 (11th Cir. 1995) (quoting *United States v. Agurs*, 427 U. S. 97, 103 (96 SC 2392, 49 LE2d 342) (1976)) (emphasis in original). The

Having reviewed the transcript of the trial court's proceedings, we conclude it is reasonably likely that the prosecution's suppression of Kent's immunity agreement with the State could have impacted upon the trial court's judgment of conviction in this matter. Kent's testimony placed Owen with the victim at the time of the murder, and provided a plausible motive for the murder – drug theft. Only Kent's testimony provided full insight into the scope of the victim's drug-dealing enterprise. Kent had first-hand knowledge of Owen's involvement in drug trafficking and his interaction with the enterprise operated by Kent and the murder victim. The murder took place in Kent's home and Kent was among the first people to see the body. Kent's testimony is not duplicated elsewhere in the record.

Evidence tending to discredit Kent's testimony could have been enough to create a reasonable doubt as to Owen's guilt. That evidence was essential to Owen's ability to mount a strong defense, and the State's suppression of the evidence undermines our confidence in the trial's outcome. Given the materiality of Kent's testimony, we conclude that, had his immunity agreement with the State been disclosed, there is a reasonable likelihood that the outcome of Owen's trial could have been different.

This Court "cannot and will not approve corruption of the truth-seeking function of the trial process,"[19] even when there is no evidence of malevolent intent on the prosecution's part. As stated in *Brady*, supra:

> Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. . . . A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile."[20]

For all of the reasons discussed above, we conclude that the State's failure to disclose to Owen its immunity agreement with its

---

State's failure on redirect examination to clarify the existence of Kent's immunity agreement justifies application of this standard. *Alzate*, supra. This corruption of the truth-seeking function of a criminal trial distinguishes this matter from *Owen*, supra, in which we held that there was not a *reasonable probability* that, had the Tayses' immunity agreements been disclosed, the outcome of Owen's trial *would* have been different. *Owen*, 265 Ga. at 70.

[19] *Williams v. State*, 250 Ga. 463 (298 SE2d 492) (1983).

[20] 373 U. S. at 87-88.

primary witness, Kent, effectively denied Owen the due process rights he was entitled to as an accused within the State's criminal justice system. Hence, the habeas court's grant of relief was proper.

2. The State's suppression of Kent's immunity agreement interfered with counsel's ability to render effective assistance at trial and on appeal. It is a bulwark of our justice system that a criminal defendant is entitled to receive effective assistance from counsel both at trial and on appeal.[21] A habeas corpus petitioner who establishes both that (1) trial or appellate counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced his defense or his appeal has overcome the procedural bar of OCGA § 9-14-48 (d), and is entitled to relief.[22]

Owen's trial counsel's ability to render effective assistance was curtailed by the State's failure to disclose its immunity agreement with Kent. As evidenced by Attorney Spruell's testimony, the State's nondisclosure caused counsel to recommend that Owen forego his right to a jury trial without full knowledge of all the information the State was obligated to disclose. The concealed evidence memorializing Kent's immunity agreement was paramount to trial counsel's ability to make an effective recommendation concerning Owen's waiver. Given the materiality of Kent's testimony (discussed in Division 1, supra), it is reasonable to conclude that if counsel had known he could readily attack Kent's credibility and discredit his testimony at trial, counsel would not have recommended that Owen waive his constitutional right to be tried by a jury of his peers.[23] By withholding evidence of Kent's immunity deal, the State caused counsel to make an uninformed recommendation to waive a jury trial, thereby rendering trial counsel ineffective.

Owen was prejudiced by trial counsel's inability to make an informed recommendation regarding waiver, since it caused him to forego his valuable right to a jury trial. Moreover, Owen also was prejudiced by counsel's inability to discredit Kent's credibility at trial with evidence of his immunity agreement.

Similarly, Attorney Spruell's ability to render effective assistance on appeal was curtailed by the State's failure to disclose Kent's

---

[21] *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Battles v. Chapman*, 269 Ga. 702 (506 SE2d 838) (1998); *Jenkins v. State*, 268 Ga. 468 (491 SE2d 54) (1997).

[22] *Battles*, supra. Insofar as Owen had the same counsel at trial and on appeal, his first opportunity to raise the effectiveness of counsel was on habeas corpus, and the issue has not been waived. *White v. Kelso*, 261 Ga. 32 (401 SE2d 733) (1992); see *Turpin*, supra.

[23] The State's nondisclosure also effectively made it impossible for Owen to make a knowing and intelligent waiver of his right to a jury trial. Knowledge of Kent's immunity deal was necessary in order for Owen himself to make a knowing and intelligent waiver of a jury trial, and unless his counsel knew of the deal, Owen could not know of it, either.

immunity agreement. The nondisclosure prevented appellate counsel from raising all of the meritorious issues available to Owen on direct appeal to this Court, thereby rendering counsel ineffective. Owen was prejudiced by this nondisclosure on appeal, as he was prevented from raising the State's concealment of Kent's immunity agreement in conjunction with the State's concealment of the Tayses' immunity agreements.

Accordingly, Owen has established that the State's *Brady* violation prevented trial and appellate counsel from rendering effective assistance, and that Owen was prejudiced as a result. Thus, the habeas court's grant of relief was proper.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 2, 2000.

*Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, H. Maddox Kilgore, Assistant Attorney General*, for appellant.
*James C. Carr, Jr.*, for appellee.