311 Ga. 855
FINAL COPY

S21A0267.  HOOD v. THE STATE.

LaGrua, Justice.

Appellant Jamie Donnell Hood appeals his 2015 convictions on a total of 36 counts charging him with murder, aggravated assault, kidnapping, carjacking, and other offenses.  The charges arose from the December 2010 shooting death of Kenneth Omari Wray and a series of crimes in March 2011 that resulted in the death of Athens-Clarke County Police Officer Elmer Christian.   With regard to his convictions for the Wray murder, Appellant contends that (1) the State violated *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963), by failing to disclose material impeachment evidence with regard to a key State's witness; (2) the trial court erred by failing to give a jury instruction on the necessity of corroborating a confession; and (3) the cumulative harm of these two errors requires reversal.   With regard to his convictions for the

murder of Officer Christian, Appellant contends that the trial court erred by (1) failing to instruct the jury on the defense of delusional compulsion and (2) admitting testimony from a responding officer about images of Officer Christian's family he saw on the on-board laptop computer in Officer Christian's patrol car. We discern no reversible error, so we affirm.[1]

---

[1] Appellant was indicted by an Athens-Clarke County grand jury in June 2011, and was subsequently re-indicted in March 2014, on a total of 70 counts, which included malice murder (2 counts); felony murder (4 counts); attempted murder (1 count); aggravated assault upon a peace officer (3 counts); aggravated assault (15 counts); armed robbery (2 counts); kidnapping with bodily injury (1 count); kidnapping (11 counts); false imprisonment (10 counts); hijacking a motor vehicle (2 counts); burglary (1 count); possession of a firearm by a convicted felon (2 counts); possession of a firearm by a convicted felon during the commission of a crime (15 counts); and possession of a knife during the commission of a crime (1 count). The State filed a notice of intent to seek the death penalty for the murders of Wray and Christian.

Approximately 15 months before trial, Appellant sought leave to represent himself. Following a hearing in accordance with *Faretta v. California*, 422 U.S. 806 (95 SCt 2525, 45 LE2d 562) (1975), the trial court granted Appellant's motion, and Appellant represented himself at trial, with attorneys from the Capital Defender's Office acting as standby counsel. Appellant's jury trial commenced in June 2015. After nearly a month, at the conclusion of the guilt-innocence phase, the jury found Appellant guilty on 36 of the 70 counts, including all counts associated with the shootings of Wray and Christian. These counts included, as to Wray, malice murder, two counts of felony murder, one count of aggravated assault with a deadly weapon, one count of firearm possession by a convicted felon, and one count of firearm possession during the commission of a crime; as to Christian, the counts included malice murder, two counts of felony murder, one count of aggravated assault upon a peace officer with a deadly weapon, one count of firearm

The evidence at trial[2] showed that Appellant was involved in the drug trade and had been supplying an associate, Kenyatta Campbell, with marijuana from a third party in Atlanta. At some point before the crimes, Campbell began bypassing Appellant by

possession by a convicted felon, and one count of firearm possession during the commission of a crime. In the penalty phase, the jury declined to impose a death sentence and recommended sentences of life in prison without the possibility of parole for the murder of Christian and life with parole for the murder of Wray. On July 24, 2015, the trial court sentenced Appellant in accordance with the jury's recommendations and, with regard to the remaining offenses, Appellant was sentenced to three additional consecutive terms of life without parole plus 300 consecutive years in prison.

On August 12, 2015, after the appointment of appellate counsel, Appellant filed a timely motion for new trial, which was amended in September 2019 and January 2020. A hearing on the motion was held on January 29, 2020. Shortly thereafter, Appellant filed a Motion to Reopen the evidence, seeking to supplement the record with new evidence in support of his *Brady* claim. On April 29, 2020, the trial court entered an order granting in part the Motion to Reopen the evidence, permitting the admission of certain documents into the record, and denying the motion for new trial. On May 22, 2020, Appellant filed a notice of appeal, and the case was docketed to the term of this Court beginning in December 2020. Appellant initially requested oral argument but later withdrew that request, and the appeal was thereafter submitted for a decision on the briefs.

[2] Because Appellant does not challenge the sufficiency of the evidence to support his convictions, and because this case involves an assessment of the harm of alleged trial court error, we present the evidence as jurors reasonably would have viewed it, rather than in the light most favorable to the verdicts. See *Davenport v. State*, 309 Ga. 385, 399 (846 SE2d 83) (2020) (announcing that this Court will no longer routinely consider sufficiency sua sponte in non-death penalty cases); *Hampton v. State*, 308 Ga. 797, 802 (2) (843 SE2d 542) (2020) ("In determining whether an error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." (Citation and punctuation omitted.)).

purchasing directly from the source, angering Appellant.

On the evening of December 28, 2010, Wray, an associate of Campbell, was shot outside the Athens home Wray shared with his mother, Ruby Jordan. Jordan testified that on the night of the shooting, she was dozing in her bedroom when she heard a knock or slam on the door and then another loud noise and her son calling for her. She then heard what sounded like firecrackers. Jordan peeked out the door and saw someone run from her driveway and, believing it was Wray, returned to her bedroom. A few minutes later, a friend of Wray came to the door, looking for Wray, and then saw him lying in the driveway.

The friend, Billy Howington, testified that he had arranged to buy marijuana from Wray on the night of December 28. Shortly before arriving at Wray's home, he texted Wray that he was approaching. When Howington arrived, he parked his car in front of the house and waited for Wray to come out. Wray did not appear and did not return Howington's texts or calls. Finally, Howington went to the door, and as he was talking to Jordan he realized Wray

4

was lying in the driveway.

A neighbor of Jordan, Mike Barnett, came outside after hearing a loud noise from the direction of Jordan's home and saw Wray's body in the driveway. As he was dialing 911, Barnett was approached by a police officer patrolling nearby, and emergency responders were dispatched. Wray had sustained multiple gunshot wounds, including one through his neck, and died after being transported to the hospital.

At the scene, investigators recovered six .40-caliber shell casings. Interviews with Howington and another neighbor indicated that the shooter was a black male. Appellant was not identified as a suspect at the time.

Some three months later, on March 22, 2011, Judon Brooks, an associate of Wray and Campbell, went to Appellant's home to inspect some marijuana. Brooks testified that, shortly after he arrived, Appellant and three masked men with firearms surrounded him, and one of the men began tying him up with zip ties. Appellant demanded that Brooks tell him Campbell's whereabouts. When

5

Brooks replied that he did not know, Appellant brandished a knife and threatened to kill him. The men put duct tape over Brooks' mouth, covered his face, and put him in the trunk of Appellant's car. Appellant drove away with Brooks in the trunk. After managing to break his hands free, Brooks opened the trunk latch and escaped when the car came to a stop. An acquaintance of Brooks who happened to be driving in the same vicinity saw him in the street seeking help and summoned him to his car. Brooks called 911, and a "be on the lookout" notice (BOLO) was issued for Appellant.

In the meantime, Appellant had abandoned his car and called his brother, Matthew Hood, to pick him up. Athens-Clarke County Police Officer Tony Howard testified that he was patrolling the area in response to the BOLO. He recognized Matthew driving and flagged him down. When Matthew stopped, Officer Howard saw a man he recognized as Appellant exit Matthew's car and run toward the driver's side of Officer Howard's patrol car. Officer Howard grabbed Appellant through his open window, but Appellant broke free, then turned and shot Officer Howard in the face and the back.

6

The responding EMT testified that when he arrived on the scene, Officer Howard's gun was still in the holster on his belt.

Appellant continued running and came upon Officer Christian's patrol car. Two witnesses saw Appellant run past the car and shoot twice through the driver's side window. Officer Christian, who at the time was talking on his phone, was struck by both bullets. By the time emergency responders arrived, Officer Christian was deceased.

Continuing to run, Appellant approached a stopped car, in which Deborah Lumpkin was sitting. Lumpkin testified that Appellant, who was armed with a gun, got in the passenger seat and told her that he was running from the police and needed her to drive. She complied. After a short time, Appellant, whom Lumpkin described as calm and focused, instructed her to stop and get out. Appellant drove off and later abandoned the car, continuing his escape on foot.

The manhunt for Appellant proceeded into the following day and night. At approximately 1:00 a.m. on March 24, Appellant went

to the home of Darius Lanier, a longtime acquaintance, who supplied Appellant with food and clothing. Lanier testified that, during Appellant's time at his home, Appellant admitted to shooting the two police officers. Appellant also told Lanier that he had killed Wray because Wray would not tell him where he could find Campbell. Appellant left at around 4:00 a.m. Later that morning, Lanier reported Appellant's visit to his probation officer, who contacted the police.

After leaving Lanier's home, Appellant found his way to the Athens subdivision of Creekstone, where he gained entry into the home of Chayandre Bess and Mandrell Hull, also acquaintances of Appellant. Bess's 13-year-old cousin, who was living with Bess and Hull at the time, testified that, as she prepared to leave for school on the morning of March 24, Appellant approached her outside the home, brandished a gun, and ordered her to let him inside. Bess, Hull, and others in the home testified that Appellant forced them into a single room, then barricaded them in the home and held them hostage until the following evening, when he surrendered to the

police.[3]

During his time in the Creekstone home, Appellant made several incriminating statements about the murder of Wray, kidnapping of Brooks, and shootings of Officers Howard and Christian. These witnesses testified that Appellant said he had shot Wray when Wray would not tell him where Campbell lived and that Appellant described specifically how Wray had called for his mother before being killed.[4] Appellant also told these witnesses that he had

[3] Appellant's conduct in gaining entry to the home and in remaining there until his surrender was the subject of numerous counts in the indictment (31 in total) charging Appellant with burglary, kidnapping, false imprisonment, and aggravated assault. Several of the purported hostages were acquaintances of Appellant and knew Brooks, Campbell, and Wray. There was testimony that some of these purported hostages were permitted to leave the home for specific purposes, under threat of harm to the others if they went to the police or did not return, and that some of them had arrived at the home after Appellant. There was also testimony that Appellant slept for some period of time while in the home and that Appellant snorted cocaine and smoked marijuana with some of the purported hostages during the episode. Appellant testified that he was allowed in the home without any coercion and that he asked the home's occupants to help him surrender to the police so they could claim the $50,000 in reward money being offered for his capture. Appellant was ultimately acquitted on all of the counts related to his conduct at the Creekstone home.

[4] In cross-examining several of the Creekstone witnesses, Appellant attempted to establish that they were motivated to implicate him in the unsolved Wray murder by the desire to avoid possible prosecution for harboring a fugitive or to avert suspicions that some of them may have assisted

kidnapped Brooks for the same reason and had intended to kill him as well. Appellant also said that, while he was sorry for killing Officer Christian, he was glad he had shot Officer Howard, with whom he had a history of ill will. In reference to the gun he used to shoot Officers Howard and Christian, Appellant remarked, "[I]f you think this one's pretty, you should have see[n] the one I killed Omari [Wray] with." Many of Appellant's statements about the crimes were surreptitiously recorded by one of the Creekstone witnesses, Quintin Riden, and the recordings were played for the jury at trial.[5]

Also while at the home, Appellant had phone conversations with both Brooks and Campbell. Brooks testified that Appellant told

---

Appellant in the abduction of Brooks. In his cross-examination of one of these witnesses, Appellant elicited that the witness had not told the police in her interview immediately after Appellant's surrender that he had admitted to the Wray murder, and he asked whether she felt "any type retaliation that [she] might be put in jail for harboring a fugitive." She responded that she had not, but she admitted that investigators "may have" asked about their participation in the Brooks kidnapping.

[5] In his cross-examination of Riden, Appellant repeatedly asked Riden whether, after telling investigators about these recordings, he had initially refused to hand over his cell phone to investigators, to which Riden replied that he did not remember. Riden also admitted on cross-examination that investigators asked him whether he had participated in the Brooks kidnapping.

him, "B**ch, you better be lucky you got away. . . . I was going to kill your b**ch a** just like I did your boy"; Brooks believed Appellant's statement was a reference to Wray's murder. In Appellant's conversation with Campbell, which Riden overheard and testified about, Appellant told Campbell that the reason he killed Wray was "because yo' b**ch a** was hiding out. You got [Wray] killed because I couldn't find you."

Shortly after his surrender on March 25, Appellant was interviewed by investigators and admitted that he had shot Officers Howard and Christian. He wrote a letter of apology to Officer Christian's family, telling them that "I just seen [Christian] at the wrong time in the wrong situation." The video recording of Appellant's interview was played for the jury, and the letter was read aloud at trial.

The State also offered audio recordings of two police interviews with Lanier, both of which were played for the jury. In the first interview, conducted on March 24, 2011, Lanier told the detective that Appellant admitted he had shot two police officers and hijacked

11

a woman's car and said he wanted to kill Campbell before he turned himself in. Lanier also told the detective that Appellant said he had killed Wray. In the second interview, conducted in April 2011, Lanier again stated that Appellant admitted to killing the officers and to killing Wray; that Appellant said he had gotten rid of the gun with which he had killed Wray; and that he had killed Wray because Wray would not reveal Campbell's whereabouts.

The State also offered testimony from a GBI firearms examiner that a .40-caliber shell casing, found in a search of Appellant's car, was fired from the same gun as that used to shoot Wray. Additional testimony established that Wray had been shot seven times, but that only six shell casings were recovered from the scene. The firearms examiner also testified that the gun used to kill Wray was not the same gun used in the police shootings.

Appellant testified in his own defense. He maintained that he was not involved in Wray's murder and told the jury that the shell casing found in his car was the vestige of an armed robbery of which he had been a victim, in which the assailant's gun had discharged in

12

his car during their struggle. Appellant also claimed that the Brooks kidnapping incident was actually initiated by Brooks, when Brooks showed up at his house with two men, threatening to kill him. Appellant claimed it was only in response that he and his associates tied Brooks up and drove away with him. Appellant testified further that, when he was fleeing after the Brooks kidnapping and encountered Officers Howard and Christian, he heard the voice of his deceased brother — who had been killed by a police officer — telling him, "Don't let them do you like they done me." Appellant testified that he continued running "out of fear. I'm running trying to get away. I'm running not to kill. I'm running to get away from them. They fixing to kill me, man."

1. In his first enumeration of error, Appellant contends that the State violated his due process rights by failing to disclose material impeachment evidence relating to Riden, the witness from the Creekstone home who recorded Appellant's statements. See *Brady*, 373 U. S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process

13

where the evidence is material either to guilt or to punishment[.]"); see also *Giglio v. United States*, 405 U. S. 150, 153 (92 SCt 763, 31 LE2d 104) (1972) (impeachment evidence affecting reliability of witness testimony falls within the *Brady* rule). Appellant claims that this violation requires the reversal of his convictions related to Wray's murder.

Riden testified at trial about having been summoned to the Creekstone home on March 24 by his friend, Hull, "to make a drug transaction." According to Riden, he and his young son arrived at the home to find Appellant, whom he knew through his sister and cousin, holding Hull, Bess, and others hostage; Riden and his son thus became hostages as well. Riden testified about statements Appellant made regarding the shootings of the officers, the murder of Wray, and the kidnapping of Brooks. Specifically, Riden testified that Appellant said he was sorry he had killed Officer Christian; that he wished he had killed Officer Howard instead; and that "the reason he did all this [was] because Judon [Brooks] and Ken Campbell . . . . went behind his back and started dealing with

14

somebody that he was dealing with on the drug level." With regard to Wray's murder, Riden testified that Appellant said he went to Wray's mother's house and

> ran up on Omari [Wray] and tell him, "Tell me where Ken at." Omari refused to tell him where Ken was . . . so he said he shot him. Omari started screaming, making noises, and he shot him again. He said he seen Omari's mama coming out to the door, and he didn't want to shoot the old lady, but if she did, he would have shot her, too. And then he just fled.

Riden also testified about overhearing Appellant's phone conversation with Campbell, in which Appellant told Campbell he was the reason Wray had been killed. Riden then testified about using his cell phone to secretly record Appellant making admissions about killing Wray. After authenticating the recordings, Riden testified as they were played for the jury, providing context and clarifying portions of the recordings that were difficult to understand.

At the beginning of Riden's direct testimony, the prosecutor elicited that Riden was at the time under indictment on federal charges. Riden testified that he had pled guilty to cocaine

15

distribution, was awaiting sentencing, and faced a sentence in the range of 84 to 105 months. The State tendered a certified copy of Riden's indictment, filed in May 2014, charging him with two counts of cocaine distribution, one count of conspiracy to possess cocaine with the intent to distribute, and one count of possession of a firearm during a drug trafficking crime.[6] The State also tendered a certified copy of Riden's September 2014 plea agreement, in which Riden agreed to plead guilty to one of the cocaine distribution charges and to cooperate fully with law enforcement by giving complete and truthful statements regarding the federal charges and "any and all criminal violations about which [he] has knowledge or information." Under the agreement, the prosecutor would consider such cooperation, if "completed prior to sentencing," in determining whether a downward departure from the advisory sentencing range would be recommended. Also included among the State's exhibits were two motions to continue sentencing, from December 2014 and

---

[6] Riden also testified that he was "originally arrested," before going into federal custody, for cocaine possession, firearm possession by a felon, and a parole violation; there was no follow-up questioning regarding these charges.

16

June 2015, respectively, citing "ongoing matters that need to be resolved prior to sentencing." On cross-examination, Riden denied that his trial testimony was in any way related to his federal sentencing and testified that he was motivated to testify because Appellant held him and his family hostage.

In the course of preparing Appellant's motion for new trial, appellate counsel learned that, at Riden's sentencing approximately one month after the conclusion of Appellant's trial, Riden was sentenced to 25 months in prison plus three years of supervised release. As reflected in the transcript from the federal sentencing hearing,[7] the prosecutor moved for a downward departure based on Riden's "significant" cooperation in Appellant's case; the trial judge noted that Riden's cooperation in Appellant's case was "far beyond what [he] normally s[aw]" and told Riden that, for this reason, he had decided to "substantially reduce[ ] the sentence."

In the course of investigating the resolution of Riden's federal

---

[7] This transcript was admitted in the record by the trial court's partial grant of Appellant's Motion to Reopen. See footnote 1, above.

charges, appellate counsel also discovered that, at the time of trial, Riden had for more than a year been facing felony charges in Athens-Clarke County for cocaine possession and other crimes.[8] There had been no mention of these state-level charges at trial, and the State does not dispute that it never made Appellant aware of these charges. Documents from the record in that proceeding reflect that, in September 2015, these charges were nolle prossed pursuant to a motion filed by the State, which cited both Riden's recent federal sentencing and his assistance to the State in Appellant's case.

Appellant contends that the dismissal of Riden's state-level charges and the leniency in his federal sentencing, both of which were explicitly tied to his cooperation in Appellant's case, are evidence of express agreements Riden made with the State and with federal prosecutors, which the State was obligated to have disclosed to Appellant under *Brady* and *Giglio*. Appellant contends that these

---

[8] In Appellant's brief here, his counsel represent that they discovered the existence of these charges "by chance alone," while investigating the federal charges. Documents from the record in Riden's state prosecution were admitted in the record here as part of the trial court's partial grant of the Motion to Reopen.

agreements significantly undercut Riden's credibility by exposing strong incentives for him to assist the State in its prosecution of Appellant and that, because of the significance of Riden's testimony, Appellant's inability to use this evidence to impeach Riden deprived him of due process under *Brady* and *Giglio*.

> It is well settled that

> "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U. S. [at 87]. This includes the suppression of impeachment evidence that may be used to challenge the credibility of a witness. See *Giglio v. United States*, 405 U. S. [at] 154-155.

*State v. Thomas*, 311 Ga. ___, ___ (3) (858 SE2d 52) (2021) (citation omitted). Accordingly, the State is obligated to reveal any agreement, even an informal one, with a witness regarding criminal charges pending against the witness. See id. at ___ (3). To prevail on a *Brady* claim, a defendant must show that

> the State possessed evidence favorable to the defendant; [the] defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence; the prosecution suppressed the favorable evidence; and had

19

the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceeding would have been different.

Id. (citation and punctuation omitted). Accord *Schofield v. Palmer*, 279 Ga. 848, 852 (2) (621 SE2d 726) (2005). On appeal, a trial court's factual findings on a *Brady* claim are reviewed under a clearly erroneous standard, and its application of the law to the facts is reviewed de novo. See *Thomas*, 311 Ga. at ___ (3).

Here, in considering Appellant's motion for new trial, the trial court assumed for the sake of argument that the evidence established that Riden had made deals to testify against Appellant with both the State and federal prosecutors and that such deals were suppressed by the State. Even assuming those facts to be true, the trial court held that Appellant had failed to establish a reasonable probability that, had this evidence been made available to Appellant, the outcome of his trial would have been different. In the trial court's view, Appellant was unable to establish the "materiality" of the suppressed evidence because of the quantum and strength of the other evidence against Appellant, independent

20

of Riden's testimony. We agree with the trial court.

In order to show materiality, a defendant need not show that he would have been acquitted had the suppressed evidence been disclosed; rather, he need only show that the suppression of the evidence "undermines confidence in the outcome of the trial." *Schofield*, 279 Ga. at 852-853 (3) (citation and punctuation omitted). In determining materiality, the court must examine the suppressed evidence in the context of the entire record. See *Turner v. United States*, __ U. S. __ (II) (A) (137 SCt 1885, 1893, 198 LE2d 443) (2017). Thus, we have held that the materiality element was established where the suppressed evidence would have impeached the testimony of the only witness who testified that the defendant confessed. See *Danforth v. Chapman*, 297 Ga. 29, 30-32 (2) (771 SE2d 886) (2015). Likewise, evidence was material where it would have undercut the credibility of the only witness who "provided full insight into" the alleged motive for the crime, and whose testimony "[was] not duplicated elsewhere in the record." *Byrd v. Owen*, 272 Ga. 807, 811 (1) (536 SE2d 736) (2000). See also *Thomas*, 311 Ga. at ___ (3) (c)

21

(materiality was shown where suppressed evidence would have impeached a witness whose testimony was highly corroborative of that of the defendant's accomplice, whose testimony was significantly impeached).  On the other hand, where there is strong evidentiary support for the defendant's conviction apart from the testimony of the witness whose credibility would have been affected by the suppressed evidence, materiality may not be established.  See *Strickler v. Greene*, 527 U. S. 263, 292-296 (IV) (119 SCt 1936, 144 LE2d 286) (1999).

Here, we note first that the jury was apprised of the fact that Riden had pled guilty to his federal charges, that his plea agreement required him to cooperate in other criminal cases about which he had knowledge, and that the prosecution was obligated to consider such cooperation in its sentencing recommendations.  Thus, while the full scope of Riden's possible incentives to cooperate with the State was not made known to the jury, the jury was nonetheless aware that there was reason to regard his testimony with skepticism.  See *Rhodes v. State*, 299 Ga. 367, 369-370 (2) (788 SE2d

359) (2016) (materiality lacking where jury did not know about specific terms of witnesses' plea deals but was made aware of their guilty pleas).

Moreover, although Riden's testimony was undeniably helpful to the State, it was largely cumulative of other evidence. First, the jury heard the recordings of Appellant's own statement in which he discussed the Wray murder. While it is true that these recordings were made by Riden, they were made prior to, and shared with investigators in the immediate aftermath of, Appellant's surrender in March 2011, years before Riden was charged in either the federal or the state case. In addition to Appellant's own statement, there was testimony from six of the Creekstone witnesses — not including Riden — about Appellant's admissions about Wray's murder. Though all six of these witnesses were relatives of Riden,[9] there were additional witnesses, not associated with the Creekstone home and not related to Riden, who also testified that Appellant made

---

[9] Specifically, these witnesses included Riden's wife, his mother-in-law and her husband, his sister-in-law and brother-in-law, and his wife's niece.

23

incriminating statements about Wray's murder. Specifically, Lanier testified that Appellant confessed to killing Wray, and Brooks testified that he understood Appellant's statement about "killing [his] boy" to be a reference to Wray's murder. All of the accounts of Appellant's incriminating statements were consistent in describing his motive for the killing, and some included details about the murder — such as the description of Wray calling for his mother — that were consistent with Wray's mother's testimony.[10] Finally, the ballistics evidence strongly supported the conclusion that Appellant was responsible for Wray's murder, because the .40-caliber cartridge casing found in Appellant's car was confirmed to have been fired from the gun that killed Wray, and, although Wray was shot seven times, only six cartridge casings were recovered at the scene.

In summary, examining the purportedly suppressed evidence in the context of the entire record, we conclude that there is not a

---

[10] In addition, at least two witnesses testified that Appellant said he had gotten rid of the gun he used in Wray's murder, which was consistent with the firearm examiner's testimony that Wray had been killed with a different gun than that used in the shootings of the officers.

reasonable probability that the jury would have reached any different verdict had it been aware of Riden's state-level charges or any additional information regarding any formal or informal agreements between Riden and either the State or federal prosecutors. The jury was already aware of Riden's possible motive to assist the State in order to gain favor with federal prosecutors, and the alleged additional impeachment material would not have been likely to make a significant impact on the jury, particularly in light of the many witnesses who gave testimony similar to Riden's and the independent evidence of Appellant's guilt. Accordingly, Appellant's *Brady* claim is without merit.

2. Appellant next contends that the trial court committed plain error by failing to instruct the jury on the statutory requirement that a confession must be corroborated to support a conviction. See OCGA § 24-8-823 (". . . A confession alone, uncorroborated by any other evidence, shall not justify a conviction."). Appellant contends that, because his confessions were critical to the State's case with regard to Wray's murder, the trial court's failure to give a

confession-corroboration instruction constitutes plain error. We disagree.

It is undisputed that Appellant neither requested a confession-corroboration instruction nor objected to the jury instructions as given at trial and that, thus, appellate review of this claim is limited to plain error only. See OCGA § 17-8-58 (b). To establish plain error,

> [the appellant] must demonstrate that the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings. Satisfying all four prongs of this standard is difficult, as it should be.

*Clarke v. State*, 308 Ga. 630, 637 (5) (842 SE2d 863) (2020) (citation and punctuation omitted). "The Court need not analyze all of the elements of the plain error test when the appellant fails to establish one of them." *Hill v. State*, 310 Ga. 180, 194 (11) (a) (850 SE2d 110) (2020).

Here, Appellant has failed to establish that the omission of the confession-corroboration instruction likely affected the outcome of the proceedings. Appellant confessed to Wray's murder not only to

26

the many Creekstone witnesses but also to Lanier, and he made an admission to Brooks by referring to killing Brooks' "boy." See *Sheffield v. State*, 281 Ga. 33, 34 (1) (635 SE2d 776) (2006) (distinguishing confessions, where entire criminal act is admitted, from admissions, where less than all the "facts entering into the criminal act" are admitted (citation and punctuation omitted)). In addition, as noted above, various facets of Appellant's confessions were corroborated by other evidence; there was a clear motive for Appellant to commit the murder; and the ballistics evidence was highly suggestive of Appellant's involvement in Wray's murder. Because Appellant made multiple confessions to different witnesses, which corroborated each other, and there was ample evidence corroborating the confessions, we conclude that it is unlikely that the absence of the confession-corroboration instruction affected the outcome of Appellant's trial. See *Clarke*, 308 Ga. at 637 (5) (no plain error in trial court's failure to give confession-corroboration instruction, where there was ample corroborative evidence); *English v. State*, 300 Ga. 471, 474-475 (2) (796 SE2d 258) (2017) (same).

27

3. Appellant next contends that the Court should evaluate cumulative prejudice, in accordance with *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020), to examine the combined prejudicial effect of the "errors" alleged in the above two enumerations.  See id. at 17 (1) (holding that appellate courts must "consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel" — at least where those errors and deficiencies involve evidentiary issues). Specifically, Appellant contends that the cumulative effect of the State's suppression of evidence regarding Riden's state and federal criminal proceedings and the trial court's error in failing to give the confession-corroboration instruction was sufficiently prejudicial to entitle him to a new trial.  We disagree.

While the cumulative prejudice rule as announced in *Lane* has so far been applied only to evidentiary error, we have noted the possibility of extending cumulative prejudice to other types of defects in trial proceedings.  See *Lane*, 308 Ga. at 17-18 (1) (suggesting that such a possibility could be considered in a future

28

case). We have also noted the potential difficulty in applying cumulative prejudice where the various defects are subject to different standards of appellate review. See *Finney v. State*, 311 Ga. 1, 13-14 (3) (a) (855 SE2d 578) (2021). Here, the materiality standard for a *Brady* violation (reasonable probability of a different outcome at trial) is similar to the plain error standard of review (error likely affected the outcome). See *Lane*, 308 Ga. at 21 (4) n.12 (noting that standard for plain error review equates to prejudice standard for ineffective assistance); *Harris v. State*, 309 Ga. 599, 607 (2) (b) (847 SE2d 563) (2020) (noting that prejudice standard for ineffective assistance is rooted in *Brady*'s materiality standard). Even assuming, however, that a *Brady* violation and an instructional error are appropriately assessed as part of a cumulative prejudice analysis, we see no cumulative prejudice here. Given the quantum and strength of the evidence, independent of Riden's testimony and corroborative of any single confession Appellant made, we conclude that it is not reasonably probable or likely that the combination of the *Brady* violation and the omitted

29

jury instruction[11] affected the verdicts against Appellant as to Wray's murder. See *Allen v. State*, 310 Ga. 411, 417-418 (4) (851 SE2d 541) (2020) (no cumulative prejudice given strong evidence of defendant's guilt).

4. Appellant contends that the trial court committed plain error by failing to give a jury instruction on the defense of delusional compulsion. Claiming that his only plausible defense as to the shootings of Officers Howard and Christian was a delusional compulsion insanity defense, Appellant contends that the trial court was required to instruct the jury on this defense despite the fact that he did not request such an instruction. We disagree, because there was not even slight evidence to support such an instruction.

To establish an insanity defense based on delusional compulsion, a defendant must show that

> at the time of the act, omission, or negligence constituting the crime, the [defendant], because of mental disease, injury, or congenital deficiency, acted as he did because of

---

[11] While we did not expressly conclude that the State violated its duties under *Brady* nor that there was clear error in the trial court's omission of the confession-corroboration instruction, we assume the existence of both defects for purposes of this analysis.

a delusional compulsion as to such act which overmastered his will to resist committing the crime.

OCGA § 16-3-3. In addition, we have held that this defense is available only if Appellant "was compelled by [his] delusion to act in a manner that would have been lawful and right if the facts had been as he imagined them to be." *Choisnet v. State*, 295 Ga. 568, 571 (2) (761 SE2d 322) (2014) (citation, punctuation and emphasis omitted).

Here, Appellant's claim of entitlement to a delusional compulsion instruction stems solely from his testimony that he shot Officers Howard and Christian in response to hearing the voice of his deceased brother urging him not to let the officers "do you like they done me." But Appellant has failed to offer any evidence — or any claim, for that matter — that at the time of the crimes he suffered from any "mental disease, injury, or congenital deficiency" as required by OCGA § 16-3-3. Moreover, Appellant himself acknowledges that, even if his alleged delusion caused him to believe he was acting in self-defense, his conduct in shooting the officers

31

would not have been "lawful and right" because he was at the time fleeing to avoid capture for the kidnapping of Brooks. See OCGA § 16-3-21 (b) (2) ("A person is not justified in using force [in self-defense] if he . . . [is] fleeing after the commission or attempted commission of a felony[.]"). Accordingly, Appellant has failed to establish any error, much less any plain error, in the trial court's failure to give a delusional compulsion insanity instruction.

5. Finally, Appellant contends that the trial court erred by admitting testimony from a GBI agent about images of Officer Christian's family that were visible on the screen of the on-board laptop computer in Officer Christian's patrol car. During the State's case, GBI Special Agent Jeff Roesler testified about responding to the scene of Officer Christian's murder and was questioned at length about the numerous photographs he took during his crime scene investigation. Among these photographs were those depicting Officer Christian's patrol car, some of which showed the monitor of an on-board laptop computer docked near the car's center console. Agent Roesler testified that during his inspection he noticed the

laptop screensaver scrolling through various images, and, when asked specifically whether any of those images showed Officer Christian's family, he responded affirmatively. Though Appellant objected to this testimony on grounds of relevance and prejudice, the State argued that the photographs showed "what was going on in [Officer Christian's] car at the time he was shot" and thus were relevant to disproving justification by showing that the car was not in motion at the time of the shooting. The trial court overruled Appellant's objections and allowed the testimony. Upon further questioning, Agent Roesler testified about "a photograph of a child by himself, and then another child, and . . . a family photograph, and . . . other photos coming across as well."

Pretermitting whether this testimony was properly admitted, any possible error in the admission of this testimony was harmless in light of the overwhelming evidence of Appellant's guilt as to the murder of Officer Christian. Appellant admits that he intentionally shot Officer Christian and, while expressing remorse, he has offered neither argument nor evidence that this shooting was justified.

33

Thus, it is highly probable that any error in admitting the testimony in question "did not contribute to the verdict." *Peoples v. State*, 295 Ga. 44, 55 (4) (c) (757 SE2d 646) (2014) (citation and punctuation omitted) (reciting standard for nonconstitutional harmless error). See also *Puckett v. State*, 303 Ga. 719, 721 (2) (814 SE2d 726) (2018) (any error in admission of photograph was harmless because evidence of appellant's guilt was overwhelming). In addition, similar testimony about these images of Officer Christian's family was given by another law enforcement officer, with no objection by Appellant. Thus, to the extent Agent Roesler's testimony was improperly admitted, it was cumulative of other unobjected-to testimony, and any error in its admission was therefore harmless. See *Rutledge v. State*, 298 Ga. 37, 40 (2) (779 SE2d 275) (2015) (because challenged testimony was cumulative of properly admitted evidence, any error in admitting it was harmless).

*Judgment affirmed. All the Justices concur.*

Decided June 21, 2021.

Murder. Clarke Superior Court. Before Judge Haggard.

*Christina R. Cribbs, Michael W. Tarleton*, for appellant.

*Brian V. Patterson, Acting District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.